ARMCO STEEL CORPORATION *v.* STATE DEPARTMENT OF ASSESSMENTS AND TAXATION

[No. 380, September Term, 1963.]

*Decided July 28, 1964.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT, HORNEY and MARBURY, JJ.

*John Henry Lewin* and *Robert M. Thomas,* with whom were *Venable, Baetjer & Howard* on the brief, for the appellant.

*George W. Baker, Jr.,* with whom were *Thomas B. Finan, Attorney General, Joseph Allen, City Solicitor* of Baltimore, and *Martin B. Greenfeld, Assistant City Solicitor,* on the brief, for the appellees.

PRESCOTT, J., delivered the opinion of the Court.

Having successfully "bearded the lion" on two previous occasions [1] to the tune of some one million or more dollars, appellant makes its third bid to avert paying to Baltimore City

---

1. These cases are Armco Steel Corp. v. State Tax Comm., 221 Md. 33 (Armco I), and 226 Md. 533. (Armco II).

a tax on certain of its tangible personal property. The origin of this litigation occurred in December, 1956, when the Mayor and City Council (Mayor and Council), by Ordinance 643, repealed a tax exemption extended to certain personal property and raw materials of manufacturers.[2] Section 4 of the Ordinance continued the exemption in favor of "ores and unrefined metals shipped into the City for processing or refining purposes, and metals derived therefrom in the hands of the refiner * * *." The meaning of these terms as used in Section 4 is fully explained in *Armco I*. In April, 1958, the Mayor and Council adopted Ordinance 1340, which reinstated, by stages, the old general manufacturers' exemption, and continued the full exemption in favor of "ores and unrefined metals" in practically the same, if not the same, language as that used in Section 4 of Ordinance 643. See Section 50 (e) of Ordinance 1340. In *Armco I, supra,* we held that Armco qualified for full exemption under the terms of the ordinance. In December, 1959, twenty-four days after our decision in *Armco I,* the Mayor and Council ordained Ordinance 156. Sections 2 and 3 of that Ordinance, which would have applied retroactively to the years 1958 and 1959, were considered and found to be "ineffective" in *Armco II*. Section 4 of Ordinance 156, which became effective on January 1, 1960, repealed and reordained with amendments Section 50 (e) of Ordinance 1340 so as to read as follows:

> "Provided, further, that in the year 1960 and each year thereafter, ores and unrefined metals shipped into the City for refining by others than the owners thereof, and the metals derived therefrom, while the said ores and unrefined metals, and metals derived therefrom, are in the hands of the refiner, shall be exempt from assessment and taxation for all ordinary municipal purposes * * *. The term 'refining' as used herein, means the reduction of ores and unrefined metals to a fine and pure state, unmixed and not alloyed with other metals or compounds."

---

2. This action was upheld by this Court in Kimball-Tyler Co. v. Baltimore, 214 Md. 86, in which case, Armco Steel Corp. was one of the appellants. A history of the manufacturers' exemption is given in this case and Armco I; so we will not repeat it here.

Armco claimed an exemption under the above section for 1960 and 1961 (after 1961 the full exemption was restored) on its ores and scrap metals which were shipped into the City for manufacture of its various grades of stainless steel. The parties stipulated as to the assessed value of said ores and metals; that they were *owned* by Armco; that they were not reduced to a fine and pure state, unmixed and not alloyed with other metals or compounds; and that Armco's operations in 1960 and 1961 were the same as those described by this Court in *Armco I*.

The State Department of Assessments and Taxation (the successor of the State Tax Commission) denied Armco's claim for exemption, and this denial was sustained by the Maryland Tax Court and the Baltimore City Court, Judge Prendergast presiding. Armco has again appealed.

Judge Prendergast below quite accurately observed "the record is quite voluminous, including not only extensive testimony * * *, but innumerable exhibits * * *." (The record extract contains 546 pages; appellant's brief 100 pages; appellees' brief 110 pages; and appellant's reply brief 30 pages.) He then stated the case could be determined by answering three questions, and proceeded to answer them. Although the "questions presented" by the appellant are, in reality, merely different alleged reasons as to why certain provisions of Section 4 of Ordinance 156 are invalid and hence there is but one basic question to be answered (Are certain of the provisions of Section 4 invalid?), we shall consider the questions as presented by appellant and answer them.

It should be noted at this time that Section 5 of Ordinance 156 provides that in case "it be judicially determined that any word, phrase, clause [etc.] * * * is invalid, the remaining provisions * * * shall not be affected thereby * * *." It is Armco's aim to have the provisions in said Section 4 "by others than the owners thereof" and the definition of "refining" stricken down, and, if this be done, Armco claims that it is entitled to the exemption under the section as it now reads.

We approach a determination of whether Section 4 is valid or invalid (other sections of the ordinance are not challenged), not from a consideration as to whether it is a classification or

subclassification of property for the purposes of taxation, but from a consideration of what it really is. In its present form, Section 4 is no more and no less than a section of an ordinance which grants a total exemption from taxation "for all ordinary municipal purposes" to certain specified classes of property. Even before the amendment of Article 15 of the Declaration of Rights in 1915, when it read "every other person [except paupers] * * * ought to contribute his proportion of public taxes for the support of government, according to his actual worth in real or personal property," exemptions have been upheld when not constituting an arbitrary discrimination in favor of a particular person or class. Judge Alfred S. Niles, in his work "Maryland Constitutional Law, at page 32, says concerning exemptions in Maryland : "This exception seems to be somewhat hard to maintain on principle, but as our court has said, the power of the legislature to grant such exemption 'has been exercised from the origin of the government.' " When approached in the manner mentioned above, many of the alleged illusory and ephemeral constitutional objections to the section, like the Arabs, "silently steal away," although the analogy between the tests to be applied in determining the validity of an exemption of property from taxation and a classification of property for the purpose of taxation is apparent.

## I and VI

These questions may conveniently be considered together. Armco opens its attack against the validity of Section 4 by claiming the exemption provided for therein was an *"ad hoc"* and "tailored" one to grant relief to only one company, and this was done by a "special" ordinance instead of a general one as required by Section 6, subsection (33) (e) of the Baltimore City Charter. The City answers by stating Section 4 was not adopted pursuant to Section 6, subsection (33) (e), but was adopted under the authority of subsection 33½, and, in any event, it was not a "special" ordinance.

The respective contentions are partially answered in *Kimball-Tyler v. Balto. City, supra,* 214 Md. 86, wherein Judge Henderson, for the Court, said "The language [of subsection 33½] is sweeping and confers the power to tax to the same extent as

the State and to modify or repeal existing or future exemptions, * * *. The mere fact that they are included in a subsection following § 33 is not controlling. We must read both subsections together * * *." (We shall refer below to appellant's claim relative to being in the same "branch of manufacturing industry" as the American Smelting & Refining Company [Asarco] as that phrase is used in subsection 33 [e].)

The quotation from *Kimball-Tyler, supra,* that subsection 33½ empowered the City "to tax to the same extent as the State and to modify or repeal existing or future exemptions," and a reading of subsection 33½ show of course, that the City has authority, under proper circumstances and within constitutional limitations, to grant exemptions, a fact that Armco does not deny. The Legislature may exempt any class of property from the payment of taxes where no constitutional provisions are violated.[3] *Oursler v. Tawes,* 178 Md. 471; *Williams v. Mayor and City Council,* 289 U.S. 36. Of course, if an exemption is purely arbitrary or capricious, or made to depend upon considerations having no connection with the exemptee's duties as a citizen and a taxpayer, and therefore bears no relation to State policy or public interest, it cannot stand against constitutional attack. *Brown v. State,* 177 Md. 321. Mr. Justice Cardozo in the *Williams* case, *supra,* wherein an exemption was attacked as being violative of the Equal Protection Clause of the Fourteenth Amendment and Article 15 of our Declaration of Rights, aptly stated the principle as follows:

> "The courts of Maryland hold that the rule of uniformity established by these provisions does not forbid the creation of reasonable exemptions in furtherance of the public good. * * * [citing cases] * * *. It does not even prohibit an exemption in favor of an individual as distinguished from one for the benefit of the members of a class. All that it exacts in respect of the narrower exemption is the presence of a relation, fairly discernible, between the good of the individual and the

---

3. It may be noted that no question of partial exemption is involved in the appeal. Cf. State Tax Commission v. Gales, 222 Md. 543.

good of the community. There must be something more than an arbitrary preference of one among many. * * *

"* * * The judicial function is exhausted with the discovery that the relation between means and end is not wholly vain and fanciful, an illusory pretense. Within the field where men of reason may reasonably differ, the legislature must have its way. * * *."

See also *State Tax Commission v. Gales,* 222 Md. 543. And compare *National Can Corp. v. State Tax Comm.,* 220 Md. 418. We think these authorities correctly and sufficiently state the controlling law with reference to the point under consideration; hence it will be unnecessary to discuss other authorities cited. We proceed, therefore, to a consideration of the trial judge's evaluation of the facts of the case, and a determination of whether they are sufficient to support his conclusion on the question.

In 1956 when the City repealed (or was considering the repeal of) the manufacturers' exemption, there were numerous protests by the owners of plants in Baltimore. All protests were ineffective except that of Asarco. It was shown that Asarco was (and is) engaged in the business of refining copper ores to a commercially pure state,[4] and it does this for others who own the ore. Asarco and other concerns in the country make this their regular business, usually refining for miners who do not have refineries of their own, but ship the ore to the refineries (in the present case of Asarco to Baltimore) for refining purposes. Operators of this kind are known as "toll refiners." The record clearly established and the trial judge found that the profits normally realized by Asarco for each ton of ore refined for others was approximately $1.50. The trial judge further found (with ample evidence to support the finding) that without the exemption the tax on each ton would amount to about $9.00. (The same situation, relatively speaking, existed in December, 1959, the time of the enactment of the present Section 4.) Thus it was shown that Asarco would

---

4. It seems to be conceded that the words in Section 4 "to a fine and pure state" do mean an "absolutely" pure state, but mean a "commercially" pure one.

have to operate at a very substantial loss if its exemption were repealed (or its customers would certainly go elsewhere). The testimony showed that there were numerous other toll refiners, not subject to a tax for refining, some as close as northern Virginia and New Jersey, to which the customers of Asarco in Baltimore could resort for the refining of their ores. (The evidence also shows that in 1960 Kennecott Refining Corporation opened a $30,000,000 plant in Anne Arundel County, where no personal property tax is imposed, for toll refining.)

Asarco complained bitterly and stated it would have to close its Baltimore plant entirely and carry on its operations in a more favorable economic climate, if its exemption were not continued. This would have resulted in the loss of jobs for some 1000 to 1500 workers in Baltimore City, and the Mayor and Council, apparently, were aware of the unfortunate public consequences if this occurred.

Armco and the other protestants were unable to show a comparable economic result to them or probable damage to the public good if they were not exempted from the tax.

In Section 1 (b) of the Ordinance, the City Council said that it had before it certain facts which showed that the failure to grant an exemption from taxation of ores and unrefined metals and metals derived therefrom (not owned by the refiner) in the hands of a refiner and where the function of the refiner was to reduce said ores and unrefined metals to a fine, unmixed and pure state without the addition of other metals or compounds "would impose an undue economic hardship on such refiner, and adversely affect Baltimore City, its residents and taxpayers, because any increased taxation" thereon would cause the owners to ship the ores and unrefined metals elsewhere for refining.

We think, and therefore hold, that the evidence supports this statement of the City Council; and the facts, as above stated, show that Section 4 meets the requirement that an exemption must be based upon "the presence of a relation, fairly discernible, between the good of the individual and the good of the community," and not be merely "an arbitrary preference of one among many." It is, therefore, a valid and duly enacted section within constitutional limitations. It will be noted that in this instance the exemption is not granted to an individual or a single

corporation, but is granted to all refiners who are able to qualify therefor under the provisions of Section 4. It, therefore, did not go so far as *Williams,* where an exemption was granted to a specific public utility corporation.

The above is a determination of the heart of the case; however appellant raises several questions, which we consider subsidiary in nature, which we shall answer.

First, we take up the objections specifically raised by appellant under question I. Section 6, subsection 33 of the Baltimore City Charter (Flack, 1949) provides, *inter alia,* that the City may, "by general ordinance," whenever it shall seem expedient "for the encouragement of the growth and development of the manufacturing industry," exempt from taxation certain specified property. And it further provides that any such exemption from taxes "shall apply to all persons, firms and corporations engaged in the branches of manufacturing industry proposed to be benefited by any [such] ordinance * * *." Appellant contends that Section 4 violates all three of these provisions. There are one or more answers to each of these contentions, but the short and complete answer to all of them is that Section 4 was enacted (as stated in the Ordinance) pursuant to the authority contained in Subsection 33½. This subsection, in part, provides that the City shall have and exercise "in addition to any and all taxing powers heretofore granted * * * to the Mayor and City Council * * *, the power to tax to the same extent as the State of Maryland has or could exercise said power within the limits of Baltimore * * * and from time to time to grant exemptions to modify or repeal existing or future exemptions * * *." Subsubsection (c) thereof repeats that "the powers herein granted to the Mayor and City Council * * * shall be in addition to any powers which it now has * * *," and in sub-subsection (d) it is provided that "all other laws, or parts of laws inconsistent with the provisions of this sub-section (33½) be and they are hereby repealed to the extent of any such inconsistency." Consequently, if we assume without deciding that Section 4 violates the limitations placed upon the Mayor and Council by subsection 33, it is clear that by the specific provisions of subsection 33½, if those limitations are inconsistent with the broad powers granted in subsection 33½, the provisions of said subsection must pre-

vail. Here Judge Henderson's language from *Kimball-Tyler,* quoted above, again becomes apposite. We repeat our holding above that Section 4 is a valid enactment of law adopted pursuant to the authority of subsection 33½.

## II

In an attempt to circumvent the effect of our holding in *Kimball-Tyler, supra,* appellant here contends that subsection 33 takes precedence over subsection 33½, enacted in 1953, because subsection 33 was repealed and re-enacted in 1959. This claim is not sustainable. Subsection 33½ is the grant of an express power to a chartered subdivision of the State. We held above that where inconsistencies occur in the two subsections, subsection 33½, by its specific provisions, prevails. However, the present contention raises an additional point, which we have reserved for consideration here.

Subsection 33 was originally enacted many years ago; subsection 33½, in its present form, was enacted in 1953. By Ch. 387 of the Acts of 1959, subsection 33 was amended. The title to this Act states that the purpose thereof is to authorize the Mayor and Council "to assess for tax purposes, levy and collect taxes annually on certain *real* property; and to assess for tax purposes, levy and collect taxes quarter-annually on certain other *real* property * * *; * * * and relating generally to * * * taxes on *real* property in Baltimore City." (Emphasis added.)

Paragraph (a) of the Act re-enacted, without change, the general grant of power to the City to assess, levy and collect taxes (which perhaps was unnecessary in the light of subsection 33½). Paragraphs (b) and (c), the only new additions, permitted the City to make quarter-annual assessments on new or damaged improvements on real property. Paragraph (d) re-enacted the provisions relating to the enforcement of the payment of taxes, and paragraph (e) re-enacted, without change, the exemption provisions relating to personal property of manufacturers, which were outlined above.

We find nothing in the Act that discloses a legislative intent to overrule or modify our holding in *Kimball-Tyler, supra,* or to make the provisions of subsection 33 prevail over the provi-

sions of subsection 33½. On the contrary, it seems apparent that the sole purpose of the Act was to obtain additional tax revenue by authorizing the assessment of real property quarter-annually. This quarter-annual assessment, of course, permitted the collection of taxes on new or improved buildings for portions of the year in which the buildings were constructed or improved. Had the Legislature intended to overrule or modify our holding in *Kimball-Tyler* by its repeal and re-enactment of paragraph (e) in Chapter 387, we think it would have said so in express terms or by clear implication, neither of which do we find in the Act. We reaffirm our ruling in *Kimball-Tyler*, and repeat that if there be inconsistencies between subsections 33 and 33½, the provisions of subsection 33½ must prevail.

### III

Appellant couches its third question in the following language:

"3. Is Section 4 of Ordinance No. 156, approved December 18, 1959, invalid and unconstitutional in violation of Article 15 of the Maryland Declaration of Rights, because it was an attempt by Baltimore City to classify or sub-classify property for taxation and exemption contrary to the classification "rule" already made by the General Assembly (by the provision "branches of manufacturing industry" in Baltimore City's Charter, Section 6 (33) (e)), and because the said classifying rule making function and power must, under said Article 15, be performed by the General Assembly alone and cannot constitutionally be delegated to a municipal corporation?"

What we said above in answer to contentions I and VI answers this contention also.

### IV

Under this heading, appellant argues that Section 4 is "discriminatory and invalid as violative of the general enabling statute, Maryland Code, Article 81, Section 9, Subsections (23) and (24) as construed and applied in *American Newspapers,*

*Inc. v. State Tax Commission,* 174 Md. 56." It contends that Baltimore City "derives power to grant exemptions from the Manufacturers' Tax from two sources, (a) Section 6 (33)(e) of its Charter * * * and (b) Maryland Code, Art. 81, Sec. 9, Subsections 23 and 24 [it will be noted no mention is made of Section 6, subsection 33½ of the Charter], a general enabling act * * *. Neither of these statutes authorizes Baltimore City to ordain the discriminations present in the case at bar." It is obvious that this is merely a repetition of appellant's claim that Section 4 is invidiously discriminatory, and refers to one other statutory source in an attempt to sustain the claim: Code (1957), Article 81, Section 9, subsections (23) and (24). (Subsection (23) does not relate to the property exempted by Section 4; so we drop it from further consideration.)

The argument would have substantial and perhaps controlling force had there been no changes in the law since the decision in *American Newspapers.* However, since then subsection 33½ has been added to the law and this Court has rendered its decision in *Kimball-Tyler, supra* (a case wherein all the parties to this appeal were also parties), where practically the same, if not the same, argument was made and decided adversely to the appellant here. There we said: "Insofar as the Legislature granted [by subsection 33½] the express power to repeal exemptions theretofore granted, it would seem to have removed, *pro tanto,* any limitations on the powers theretofore granted, express or implied. It should be noted that under Section 2, Article 11A of the Maryland Constitution, the City has no authority at all to legislate on the subject of its express powers, contained in Section 6 of the Charter. Only the General Assembly can alter those provisions and it has done so [by subsection 33½]. Whether the City would have the power to repeal other exemption provisions in Code (1951), Art. 81, Sec. 8 [now Section 9] which do not depend upon local action, we need not now consider [and again we are not called upon to consider the same]. Subsections (23) and (24) of sec. 8 are unique in this respect."

In any event, we have pointed out above that subsection 33½ empowers the City to grant exemptions under proper circumstances; that Section 4 grants a total exemption to a speci-

fied class of property; and that this exemption has a real relationship to the public good and is not arbitrary or capricious. And, after a careful consideration of Section 9, subsection (24) and its relationship to Section 4 of the subject ordinance, we find nothing in said subsection (24) that renders the provisions of Section 4 invalid.

V

This leaves for consideration appellant's claim that Section 4 "is invalid as in violation of Section 5 of Baltimore City's Charter, which provides that 'The taxes levied by the City, with respect to ownership of the same class of property or property rights, shall be uniform in rate throughout the entire city.' " Appellant here contends that the above section prohibits exemptions from assessment based on ownership of property and thus the non-ownership qualifying characteristic in Section 4 violates the section. In so contending, appellant seems to ignore the fact that there is a distinct difference between an assessment and a tax levy. A careful reading of Section 5 discloses, we think, that the phrase "with respect to ownership of the same class of property or property rights" was intended to distinguish between levies made with respect to the *ownership* of property and those made with respect to the *use* of property. In other words, the above phrase distinguishes between levies made for direct taxes based specifically upon the ownership of the property taxed and other taxes, such as license, franchise and excise taxes.

The history of Section 5 clearly supports the above conclusion. When Section 5 was adopted in the 1949 revision of the City's Charter, it replaced former Section 4 thereof. For many years, that section had required property that was annexed to the City in 1888 (the "Old Annex") and property that had been annexed in 1918 (the "New Annex") to be taxed at a lower *rate* than property located within the old limits of the City.

The Annexation Act of 1888 provided that until the year 1900, the *rate* of taxation upon real and personal property in the annexed territory should not exceed the *tax rate* of Baltimore County for the year 1888, and that the assessments should not be increased prior to 1900. Acts of 1888, Ch. 98, pp. 127-

128. Those provisions were included without substantial change as Section 4 of the "new charter" approved by the Acts of 1898, Ch. 123, pp. 242-243. By the Acts of 1908, Ch. 286, Section 4 was repealed and re-enacted to provide that all personal property annexed under the "Old Annex" should be subject to assessment in the same manner and form, and at the same *rate* of taxation, as property within the old limits of the City. It further provided that beginning in 1909, all real and leasehold property in the annexed territory should be divided into three separate classes, each with a different tax *rate*. The limitation on *assessments* had expired in 1900, and no limitation with regard to assessments was included in new Section 4.

The "New Annex" was accomplished by Ch. 82 of the Acts of 1918. That Act provided that the property in the "New Annex" should constitute a separate taxing district of the City; that for 1919, the tax *rate* in the district should be limited to 60% of the full city rate; and there should be an increase of 2% of the full City rate each year thereafter until the rates of the City and the "New Annex" coincided which would be in 1939. It then provided that beginning in 1939 and thereafter the *tax rate* should be the same in the entire City, but that nothing in the Act was intended to repeal any law or ordinances fixing different *rates* of taxation upon different classes of property, it being the intention that "beginning with the year 1939 and thereafter, there shall be the same rate of taxation throughout the entire limits of Baltimore City upon the same classes of property." It further provided that the provisions of the City Charter with regards to assessments should apply to the "New Annex," except there should be no increase thereof prior to 1922.

Section 4 of the Charter was amended by Ch. 721 of the Acts of 1920 and the Acts of 1927, Ch. 331 made changes relative to the rates in certain of the "Old Annex" territory. It will be unnecessary to relate the details thereof. The legislation looked forward to a uniform *rate* of taxation in the "Old Annex" and the City after 1938.

No change was made in Section 4 when the recodifications of the City Charters of 1927 and 1938 were adopted. The next edition of the City Charter was in 1949. By this time, all of the

territory in the "Old Annex" and the "New Annex" was subject to the full City *rate*. However, as previously mentioned, the Acts of 1918, Ch. 82, provided that the requirement of a uniform tax rate beginning in 1939 should not prevent the fixing of different *rates* of taxation upon "different classes of property." That Act was not repealed. It seems apparent to us that the framers of the 1949 Charter desired to provide, and did provide, for a uniform tax *rate* throughout the City of taxes levied with respect to the ownership of the same class of property, but allowed different rates of taxation for "different classes of property." We think it is clear that a limitation on a tax rate is not a limitation on exemptions from assessment. It is subsection 33½ that deals with exemptions, not Section 5 of the Charter. We hold that nothing in Section 4 of Ordinance 156 conflicts with Section 5 of the Charter.

Since the remaining questions presented by the appellant are all predicated upon the invalidity of Section 4, it is unnecessary to discuss them.

*Order affirmed, appellant to pay the costs.*