MURRAY, TRUSTEE, ET AL. AND CREE, ET AL. *v.*
COMPTROLLER OF THE TREASURY,
STATE OF MARYLAND, ET AL.

[No. 189, September Term, 1965.]

384

Decided *February 14, 1966.*

The cause was argued before PRESCOTT, C. J., and HAM-
MOND, HORNEY, MARBURY and OPPENHEIMER, JJ.

*Leonard J. Kerpelman* for Lemoin Cree and his wife, and the
Freethought Society of America, part of appellants; and *Mar-
tin J. Scheiman,* with whom were *Good & Haffner* and *Wal-
ter S. Haffner* on the brief, for Madalyn E. Murray, Trustee,
and others, other appellants.

*Thomas B. Finan, Attorney General,* with whom was *Robert C. Murphy, Deputy Attorney General,* on the brief, for Comptroller of the Treasury and others, part of appellees; *Francis X. Gallagher* for the Most Reverend Lawrence J. Shehan, Roman Catholic Archbishop of Baltimore, another appellee, *Joseph Allen, City Solicitor,* and *Clayton A. Dietrich, Chief Assistant City Solicitor* on the brief, for Supervisor of Assessments of Baltimore City and others, part of appellees; *William L. Marbury* and *Mathias J. DeVito* on the brief for The Convention of the Protestant Episcopal Church of the Diocese of Maryland, other appellees; *Marvin Braiterman* for Temple Emanuel of Baltimore, another appellee; *George F. Flentje, Jr.,* with whom was *Earl E. Manges* on the brief, for Maryland Synod of the Lutheran Church in America, other appellee.

OPPENHEIMER, J., delivered the opinion of the Court.

Maryland's statutory exemption from state, county and city taxation of structures used exclusively for public worship and any parsonage and grounds appurtenant thereto is attacked as violative of the Declaration of Rights of the Maryland Constitution and of the First and Fourteenth Amendments to the Constitution of the United States. The question is raised by a taxpayers' suit filed by Mrs. Murray as trustee and Mrs. Mays, as taxpayers and citizens of Maryland, on their own behalf and on behalf of all other taxpayers similarly situated, in the Circuit Court No. 2 of Baltimore City. Mr. and Mrs. Lemoin Cree, residents of and taxpayers in Frederick County, and Freethought Society of America, an Ohio corporation which owns real estate in Baltimore City, were permitted to intervene as additional parties plaintiff. The defendants are the Comptroller of the Treasury of Maryland, the State Director of Assessments and Taxation, the Supervisor of Assessments of Baltimore City and the Director of Assessments for Baltimore City. The court below permitted five religious bodies to intervene as parties defendant: the Roman Catholic Archbishop of Baltimore, the Convention of the Protestant Episcopal Church in The Diocese of Maryland, the United Christian Citizens, Incorporated, Temple Emanuel of Baltimore, and the Maryland Synod of the Lutheran Church in America.

The statute attacked as unconstitutional is Code (1965 Repl. Vol.) Art. 81, Section 9(4) which reads as follows:

"§9. -*Exemptions.*

The following shall be exempt from assessment and from State, county and city taxation in this State, each and all of which exemptions shall be strictly construed:

\* \* \*

"(4) *Churches, parsonages, etc.*—Houses and buildings used exclusively for public worship, and the furniture contained therein, and any parsonage used in connection therewith, and the grounds appurtenant to such houses, buildings and parsonages and necessary for the respective uses thereof."

At the time the suit was filed, there were 57 items of exempt property set forth in Section 9, including the buildings and grounds of hospitals, charitable institutions, educational and literary institutions, nonpolitical clubs and Boy and Girl Scouts.[1]

Mrs. Murray, one of the original plaintiffs,[2] and Mr. Cree, an intervening plaintiff, are atheists. Mrs. Murray as trustee and Mrs. Mays, the original plaintiffs, own property in Baltimore City on which, in 1964, they paid taxes of $353.50. Mr. Cree is a Research Analyst in Micro-biology at Fort Detrich, in Frederick County. He and his wife own about two acres of land in that county upon which they paid taxes, in 1964, to the county and State of Maryland in the amount of $40. The Freethought Society of America, Inc. publishes the "American Atheist", a monthly magazine. It owns a building in Baltimore upon which taxes were paid, in 1964, in the amount of $350.09.

The plaintiffs-appellants contend that the exemptions granted under Subsection 9(4) of the Maryland statute violate Ar-

---

1. At the present time, there are 60 categories of exempted property. Code (1965 Repl. Vol.) Article 81, Section 9.

2. Mrs. Murray was not in the State at the time of the hearing below and did not testify. Her beliefs about religion, however, are set forth in Abington School Dist. v. Schempp, 374 U. S. 203, 211 (1963) and Murray v. Burns, 405 P. 2d 309 (Haw. 1965).

ticles 15, 23 and 36 of the Maryland Declaration of Rights; that they are in violation of the Equal Protection Clause of the Fourteenth Amendment to the federal Constitution; and are in violation of the First Amendment to the Constitution made applicable to the states through the Fourteenth. The defendants-appellees maintain that the exemptions are constitutional under both the Maryland Declaration of Rights and the federal Constitution. The appellee Temple Emanuel contended below and contends here that the taxation of property used for worship would unconstitutionally abridge the free exercise of religion protected by the First Amendment. The Maryland Synod of the Lutheran Church joins in this contention in this appeal. All of the appellees contend further that the appellants do not have standing to bring the suit.

At the hearing below, it was shown that the records of Baltimore City indicate the total assessable basis of the city for 1964 as follows:

All taxable real property ........ $2,263,708,768.00
All tax exempt property ........ 578,997,400.00

The approximate total assessments exempt from taxation in the City in the levy for 1964 under the statutory provision here involved were as follows:

Protestant ..................... $41,031,430
Roman Catholic ................ 31,339,880
Jewish ....................... 6,136,510

The Chancellor found that the total assessed value of real estate in Baltimore City exempt from taxation under Article 81 Section 9 is over 20% of the total assessed value of all real estate in Baltimore. The exemption under the subsection here involved is approximately 2.8% of the total assessed value of all Baltimore City real estate and approximately 13½% of the total assessed value of tax exempt real estate in the City. The state tax rate, levied to protect the bond issues of the State, is fifteen cents for $100 of assessed value.

It was agreed that the Roman Catholic Archbishop of Baltimore is a corporation having title to various properties of the Roman Catholic Church of Baltimore City, including 163 parishes or mission churches with an aggregate value of Diocesan

properties in excess of $2,000,000. The Maryland Synod of the Lutheran Church owns property in Baltimore City in excess of $13,600,000. Temple Emanuel is a Reform Jewish Congregation whose synagogue is in Baltimore City.

At the hearing, Mr. John G. Arthur, Director of the Department of Assessments of Baltimore City, who has been with that department for 38 years, testified for the appellants. His testimony as to applying the statutory exemption was summarized by Judge Barnes as follows:

> "In applying this exemption, Mr. Arthur and the City Department of Assessments have given the words 'public worship' a comprehensive interpretation. Houses, buildings and appurtenant lands used for teaching or contemplating the beliefs of *any* philosophical system regardless of whether that philosophical system includes a belief in a Supreme Being, are considered to be exempt under Section 9(4) and such exemptions are granted in the regular course of administering the tax laws. For example, the property used by the Baltimore Ethical Culture Society which does not teach any belief in a Supreme Being, but which confines its teachings to moral and ethical standards and educational purposes has been exempted under Section 9(4). Property used by Buddhist organizations for their religious teachings are exempted. The Philosophical College of Occult Science has had its property exempted under Section 9(4). Over objection and subject to exception, Mr. Arthur testified that after having heard Mr. Cree describe his philosophical system, if application were made, the property of the Freethought Society would be granted an exemption under Section 9(4)."

The Chancellor also found that the real property of churches not used for houses of worship and parsonages, but held for other use and for future construction of church edifices, is subject to real estate taxation to the same extent as similar property held by private persons.

At the conclusion of the case below, Judge Barnes, in a com-

prehensive opinion, found that the plaintiffs-appellants had standing to sue but that the statutory exemption here involved did not violate the Maryland Declaration of Rights or the federal Constitution. In this appeal from his decision, we shall first consider the standing of the appellants to sue, then the questions raised under the Maryland Declaration of Rights and, finally, the issues under the federal Constitution.

## The Appellants' Standing to Sue

In Maryland, taxpayers have standing to bring suit to challenge the constitutionality of a statute when the statute as applied increases their taxes. *McKaig v. Mayor and City Council of Cumberland,* 208 Md. 95, 102-103, 106, 108, 116 A. 2d 384 (1955) and cases therein cited. If the taxpayers cannot show a pecuniary loss or that the statute results in increased taxes to them, they have no standing to challenge it. *Citizens Comm. v. County Comm'rs. of Anne Arundel County,* 233 Md. 398, 401-405, 197 A. 2d 108 (1964) and cases therein cited.

A class suit is here involved. Under Section 9(4) over $78 million dollars of real estate is exempted from taxation out of a total assessment basis of Baltimore City of over $2 billion. The class of taxpayers represented by the appellants, other than the Crees, would pay less real estate taxes to the City if the exemption were not in effect. The property owners who pay real estate taxes to the state, represented by all the appellants, would pay less taxes to the state if the exempted property were taxed.

The appellees rely on statements in *Citizens Committee* that the appellants there had failed to show any special damage or loss peculiar to themselves as taxpayers or otherwise, and that, to have standing, the persons who bring the suit must show a special interest in the subject matter distinct from that of the general public. In *Citizens Committee,* the appellants had filed suit as citizens and taxpayers to challenge the constitutionality of local laws and resolutions authorizing the operation of gambling devices in Anne Arundel County. The Court found it evident that the taxpayers would be damaged by a discontinuance of the program rather than a continuance of it. Here, the converse is true.

The appellees further contend that, even if the appellants have

standing to sue under the Maryland law, they lack standing under the federal law to attack the constitutionality of the statute under the federal Constitution. We do not agree. When the validity of a state statute is attacked in a state court, it is the duty of that court to determine all the constitutional issues involved, federal as well as state. If the statute is held valid under the state law, but invalid under the federal Constitution, the state court must give the complainants the relief they pray. The appellants have elected to raise the federal Constitutional questions in a state court, as they had the right to do. If they have standing under the law of Maryland to bring the suit, it is irrelevant that the result might have been different had the action been instituted in a federal court.

The appellants had standing to bring the suit in Maryland courts, and, in their suit, to raise any constitutional question in respect of the statute, state or federal.

### The Provisions of the Maryland Declaration of Rights

The appellants contend that the subsection of the statute is unconstitutional under Articles 15, 23 and 36 of the Maryland Declaration of Rights. Article 15 provides that all taxes for the support of the state and local governments shall be uniform. Article 23 states that no man shall be deprived of life, liberty or property except by the law of the land, which, this Court has held, is the equivalent of due process of law. Article 36 deals with religious freedom; it provides, in part, that no person ought to be compelled to maintain or contribute to maintain any place of worship or any ministry.

This Court has consistently recognized the power of the legislature to grant full exemptions from taxation when reasonable and for a public purpose. *State Tax Com'n. v. Gales,* 222 Md. 543, 548-550, 161 A. 2d 676 (1960) and authorities therein cited. When made for such a purpose and uniformly applied, the exemption does not violate Article 15 of the Declaration of Rights (even before the 1915 amendment when uniformity was required with regard to assessment as well as with regard to tax rates) or due process of law under Article 23. *National Can Corp. v. Tax Com'n.,* 220 Md. 418, 153 A. 2d 287 (1959); *State Tax Com'n. v. Gales, supra.* See also *Armco Steel Corp.*

*v. State Dept. of Assessments and Taxation,* 236 Md. 168, 175-176, 202 A. 2d 741 (1964).

*Williams v. Mayor and City Council of Baltimore,* 289 U. S. 36, 41 (1933) involved the validity of a Maryland statute under which the property of a particular railroad was made exempt from taxation. The cities of Baltimore and Annapolis challenged the validity of the exemption. The District Court upheld the validity of the statutory exemption, the Circuit Court reversed, and the Supreme Court reversed the Circuit Court. In delivering the Supreme Court's opinion, Mr. Justice Cardozo held that the municipal corporations, being creations of the state, were without standing to invoke the protection of the federal Constitution but that the statute was valid under Article 15 of the Maryland Declaration of Rights. He said:

> "The courts of Maryland hold that the rule of uniformity established by these provisions does not forbid the creation of reasonable exemptions in furtherance of the public good * * * It does not even prohibit an exemption in favor of an individual as distinguished from one for the benefit of the members of a class. All that it exacts in respect of the narrower exemption is the presense of a relation, fairly discernible, between the good of the individual and the good of the community."

General tax exemptions for property dedicated to religious uses have long been regarded in Maryland as reasonable and for a public purpose. The Chancellor succinctly gave the history of tax exemption of houses of worship in Maryland as follows:

> "An exemption from taxation similar to that granted by Section 9(4) has existed in Maryland since the State began the general taxation of real estate by the Act of 1797, Chapter 89, passed on January 20, 1798. The exemption in that Act was: 'except property belonging to the State or the United States, houses for public worship, burying grounds * * *'. This basic exemption has continued in each tax statute adopted in Maryland since the original Act of 1797, Chapter 89 until the present time."

Concurrently with this continuous exemption, Maryland has had in effect another measure, Article 38 of the Declaration of Rights, directed to the separation of church and state. That Article requires the sanction of the General Assembly for any gift, sale or devise of land "for the support or benefit of any Religious Sect, Order or Denomination * * *; except always, any sale, gift, lease or devise of any quantity of land, not exceeding five acres, * * *" for a house of worship, a parsonage, or burying ground.

In *Vansant v. Roberts,* 3 Md. 119, 128-29 (1852), the Court considered the purpose of this Article. Judge Mason, for the Court, said:

"The 34th section of the Bill of Rights is analogous to the British *statutes of mortmain,* which were introduced to check or prevent ecclesiastics from accumulating in perpetuity, in *mortua manu,* or hands that never die, the lands or property of the kingdom, and thereby withdrawing them from public and feudal charges. This provision in our Bill of Rights, was designed for the protection or benefit of the people of Maryland from similar evils, * * *"

In 1948, by constitutional amendment, Article 38 was changed so as not to require the sanction of the General Assembly to a gift, sale or devise to a religious organization, but the legislature was given the right to require such sanction by statute. While the ownership of land by a religious organization has been consistently circumscribed by constitutional provision, therefore, gifts or devises for houses of worship and parsonages have been permitted, in the same Article, without legislative sanction.

*Baltimore City v. Starr Church,* 106 Md. 281, 286, 67 Atl. 261 (1907) held that a special act of the legislature granting exemption for a specific property owned by a church of one denomination was unconstitutional, because it violated Article 15 of the Declaration of Rights and Article III, Section 33 of the Maryland Constitution. However, Judge Rogers, for the Court, had this to say as to the validity of the statutory exemption from taxation of houses used for public worship:

"It will not be denied at this late day that the Legislature has the power, *within reasonable limits,* to exempt certain *species* or *classes* of property from taxation, when the *public interests* so require. This is actually done in the case of houses used exclusively for public worship, and the grounds appurtenant thereto, in the case of graveyards and cemeteries, and in the case of hospitals, asylums and benevolent institutions. (Code, 1904, Art. 81, sec. 4). The validity of provisions of this kind is too well established to be now questioned. But it will be perceived in these cases *all* the property of the *class* indicated is exempted. The Legislature does not exempt *some* houses of public worship and tax others. It does not exempt *some* graveyards and cemeteries, *some* hospitals, and then tax other properties of exactly the same kind. It does not arbitrarily say that *this* particular house of public worship shall be exempt, but *that* one shall be taxed. On the contrary, *all* property falling within any one of the classes mentioned in Sec. 4, is exempt. There is therefore no arbitrary discrimination between different properties of the same kind, but all are treated alike."

Occasionally a dictum, when it strikes a note resonant with accepted legal principle, becomes as important as the actual decision. This has been the case in *Starr.* The statement quoted has been cited with approval as late as *State Tax Com'n. v. Gales, supra.*

The exemption here involved violates no provision of the Maryland Declaration of Rights.

*The Equal Protection Clause of the Fourteenth Amendment*

The appellants contend that by the exemption here involved, the State of Maryland has deprived them of the equal protection of the law guaranteed by the Fourteenth Amendment and that the criterion for the distinction is discriminatory and not justifiable under the Amendment.

The Supreme Court has repeatedly held that state exemptions of a class from taxation not clearly unreasonable do not infringe the equal protection clause. In *Carmichael v. Southern*

*Coal & Coke Co.,* 301 U. S. 495, 509 (1937), Mr. Justice Stone said, for the Court:

> "It is inherent in the exercise of the power to tax that a state be free to select the subjects of taxation and to grant exemptions. Neither due process nor equal protection imposes upon a state any rigid rule of equality of taxation * * * This Court has repeatedly held that inequalities which result from a singling out of one particular class for taxation or exemption infringe no constitutional limitation."

In *Gibbons v. District of Columbia,* 116 U. S. 404, 407-08 (1886), Archbishop Gibbons had appealed from a decree dismissing his bill in equity which claimed that the assessment and tax on lots owned by a Catholic church in the City of Washington were in violation of an Act of Congress which exempted from taxation church buildings and grounds actually occupied by such buildings. A similar exemption had been in effect under authority delegated by Congress as early as 1802. The lots in question, the Court found on the uncontroverted facts, were unnecessary for the enjoyment of the church and were to be sold or leased. The Court held that, under the circumstances, the lots were not exempt from taxation. However, Mr. Justice Gray, in delivering the Court's opinion, said that the power of Congress functioning as a local legislature for the District of Columbia to levy taxes for District purposes only "in like manner as the legislature of a State may tax the people of a State for State purposes" was clear and that "[i]n the exercise of this power, Congress, like any State legislaturè unrestricted by constitutional provisions, may at its discretion wholly exempt certain classes of property from taxation, or may tax them at a lower rate than other property."

In *Bell's Gap R. R. Co. v. Pennsylvania,* 134 U. S. 232, 237 (1890), the Court said:

> "The provision in the Fourteenth Amendment, that no State shall deny to any person within its jurisdiction the equal protection of the laws, was not intended to prevent a State from adjusting its system of taxation in all proper and reasonable ways. It may, if it

chooses, exempt certain classes of property from any taxation at all, such as churches, libraries and the property of charitable institutions."

The statements in *Gibbons* and *Bell's Gap* as to the validity of exemptions of church property from taxation are dicta, and in neither case was the applicability of the First Amendment, through the Fourteenth, considered. Apart, however, from the possible impact of the First Amendment, it is evident to us that, under the subsection, all organizations having beliefs about religion are treated uniformly as a class, and that the exemption here involved does not violate the equal protection clause.

### The First Amendment

The appellants contend that the "establishment" clause of the First Amendment, made applicable to the states through the Fourteenth, prohibits indirect subsidies to religious organizations by tax exemption as clearly as it makes invalid any tax levied directly to support such organizations. The appellees Temple Emanuel and the Maryland Synod of the Lutheran Church take the position that, even without the statutory exemption, the "free exercise" clause of the First Amendment would make the taxation of the property of houses of worship unconstitutional. The other appellees maintain that the tax exemption is not within the category of governmental "establishments" proscribed by the Constitution, but is a permissible "accommodation" to religion which the government may, in pursuit of its policy of neutrality, grant to religious institutions in the same manner in which it grants similar exemptions to secular charitable institutions.

The Supreme Court of the United States has firmly established that the Fourteenth Amendment makes the First Amendment applicable to the states. *McGowan v. Maryland*, 366 U. S. 420, 429 (1961) and cases cited in footnote 5; *Torcaso v. Watkins*, 367 U. S. 488, 492 (1961); *Sherbert v. Verner*, 374 U. S. 398, 402 (1963). The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * *" It was not until 1947 that the nature of the "establishment" clause was discussed in depth by the Supreme Court. *Everson v. Board of*

*Education*, 330 U. S. 1 (1947). Since *Everson*, there have been a number of decisions of that Court involving the "establishment" clause. The holdings of these cases are too well-known, their purport has been too widely discussed, and views of the individual Justices too often quoted and analyzed for us again to survey familiar ground. There are intimations or even expressions of opinions by individual Justices on the questions here involved, but we agree with counsel that in no case has the Supreme Court given an opinion on or in specific terms discussed the constitutionality of tax exemptions of religious organizations.

In our reading of the opinions, however, we find broad guide lines which form the frame within which the case before us is to be considered. We are a religious people and recognize the effect religious institutions have on human activity. The First Amendment was designed to erect "a wall of separation between church and State." Mutual independence, under our Constitution, is deemed best for the State and best for religion. The State cannot forbid nor can it perform or aid in performing the religious function. Like other broad constitutional concepts, the meaning of "separation" is to be ascertained in the application of the principle to specific cases. A state cannot pass a law to aid one religion or all religions, but state action to promote the general welfare of society, apart from any religious considerations, is valid, even though religious interests may be indirectly benefited. If the primary purpose of the state action is to promote religion, that action is in violation of the Amendment, but if a statute furthers both secular and religious ends, an examination of the means used is necessary to determine whether the state could reasonably have attained the secular end by means which do not further the promotion of religion.

In the consideration of the impact of the "establishment" clause upon the tax exemption here involved, some conclusions are evident. By granting the exemption to church properties, Maryland does not support all religious bodies or any of them in the sense that the state espouses their acceptance or the acceptance of any of them by its citizens. The exemption goes, not only to all church owned properties, but to all properties

owned by any organization which has definite views about religious beliefs, including religions such as Buddhism and organizations such as the Ethical Society, which do not believe in a Supreme Being. The property of the Freethought Society, one of the appellants, an atheistic organization, would be entitled to the exemption if it asked for it. In Maryland, tax exemption is by no means synonymous with approval of the purposes of the body whose property is exempt. The property of charitable organizations is one of the 57 exempted categories. In *Register of Wills for Baltimore City v. Cook,* 241 Md. 264, 216 A. 2d 542 (1966), we held that bequests creating trusts to be used, among other purposes, for the passage of the Equal Rights Amendment, to remove alleged discriminations against women, were entitled to exemption from collateral inheritance tax because the bequests were charitable in nature. If the funds left by the testatrix were used, in part, for the erection of a building for the administration of the trusts, the property would be exempt under Article 81, Section 9(7) ; but the exemption would not mean that Maryland favors the passage of the amendment.

Indubitably, religious organizations benefit from the exemption. Economically, they are in the same position as though they paid taxes to the city and state and then received back the amounts paid in the form of direct grants. Moreover, members of the general public pay higher taxes than they would if the exemptions were not in effect; the same amount of revenue must be raised and, by reason of the exemption, the rate paid by non-exempt taxpayers is higher.

To the appellants, this conclusion is the end of the case. They submit that the First Amendment forbids any appropriation of public funds to support religious organizations; that the effect of the exemption is the same as that of a direct appropriation; that the "establishment" clause bars not only laws establishing a church or sect, but any law respecting an establishment of religion; and that the Maryland statutory exemption is such a law, because the State cannot do indirectly what it cannot do directly. Logically, this argument is strong. But, as this Court has said before, logic is a minion of the law, not its master. The question before us involves the power of a state to legislate

for the general welfare as well as the constitutional prohibition, the assay of legislative motives, the weighing of economic factors apart from pecuniary benefit to religious organizations, and the historic attitude of the states and federal government towards the interpretation of the separation concept. Judicial duties would be easier if constitutional problems could be solved by logical theorems.

That the states do not believe tax exemption of the property of religious institutions violates any constitutional prohibition is evident. Constitutional or statutory provision for such exemption exists today in every state and the District of Columbia.[3] "This history cannot be explained solely as a carryover from the earlier days of established churches. These exemptions are found also in states formed and organized after churches had been disestablished in the colonial states. In many states they have also been recently amended to extend the scope of the exemption. This suggests a rationally conceived and deep-seated policy, and not an accidental or vestigial survival of outmoded practices." Kauper, *The Constitutionality of Tax Exemptions for Religious Activities* in "The Wall Between Church and State", 95, 110 (Oaks ed. 1963).

It is true that the protection of individual rights guaranteed by the federal Bill of Rights is not dependent upon majority approval. It is also true that the historical argument, while it casts some light, is not conclusive. *Compare Brown v. Board of Education,* 347 U. S. 483, 489 (1954), *with McGowan v. Maryland,* 366 U. S. 420, 440-42 (1961). Nevertheless, in the words of Mr. Justice Holmes, "(i)f a thing has been practical for two hundred years, it will need a strong case for the Fourteenth Amendment to affect it." *Jackman v. Rosenbaum Co.,* 260 U. S. 22, 31 (1922). It is significant, in our opinion, that the act exempting church property in the District of Columbia from taxation (the successor of which was before the Court in

---

3. Note, Constitutionality of Tax Benefits Accorded Religion, 49 Colum. L. Rev. 968 (1949); and Van Alstyne, "Tax Exemption of Church Property", 20 Ohio St. L. J. 461 (1959); Alaska and Hawaii, the last two states to be admitted to the Union, have similar exemptions. Alaska Const. Art. IX, sec. 4; Rev. Laws of Hawaii 1955 (1961 Supp.) ch. 128-18.

*Gibbons v. District of Columbia, supra*) was first adopted in 1802 by the corporation of the City of Washington (Act of Oct. 6, 1802, ch. 5, Washington City Laws 1802-03) under authority delegated by Congress (Act of May 3, 1802, ch. 53, 2 Stat. 195), approximately eleven years after the adoption of the first ten amendments. Congress thereafter amended the act incorporating the City of Washington but permitted the exemption to remain (Act of Feb. 24, 1804, ch. 14, 2 Stat. 254). It seems a reasonable assumption that members of the Congress in the early years of the nineteenth century were personally familiar with the purposes and scope of the First Amendment, and did not regard the exemption as inconsistent therewith.

We turn to a consideration of reasons why the General Assembly of Maryland, within its legislative discretion, may have reasonably determined that the tax exemption here involved is for the general welfare, apart from any benefit that religious organizations derive from it. As *McGowan* makes clear, even though the exemption had an unmistakably religious origin, if the present purpose and effect of the exemption is primarily secular, and if those secular purposes could not reasonably be deemed achievable without an incidental benefit to religious organizations, the "establishment" clause is not violated.

It is not disputed that today religious organizations, as a major part of their functions, carry on activities secular in nature, of substantial benefit to the community, such as aid to the poor and aged, day nurseries, care of the sick and efforts to eliminate racial inequalities. Programs such as these serve public needs; the performance of these functions by private agencies saves the State the expense of providing the same services. If there could be a fair and practical division of the portions of church owned properties devoted to the conduct of such secular activities, a proportionate tax exemption of the parts of the properties devoted to such uses could have been considered. But the practical administrative difficulties in such an apportionment are apparent, and courts cannot say that the expense and inconvenience involved would not be disproportionate to the revenue obtained. *Carmichael v. Southern Coal & Coke Co., supra,* 301 U. S. at 511. If no exemption were given the religious organizations for the partial use of their properties

for secular purposes, when charitable and other institutions which carry on similar work are granted exemption, serious questions of unconstitutional discrimination might arise.

Difficulties of another nature may be deemed inherent by the legislature if a tax were levied upon all or part of church properties. Attacks could be made upon the tax as a violation, not of the "establishment" clause, but of the "free exercise" provision. The arguments advanced by Temple Emanuel and the Maryland Synod of the Lutheran Church that any taxation of church owned property would contravene the "free exercise" clause have at least sufficient weight to be a legitimate motive for a legislative determination that the risk should not be run. See *Murdock v. Pennsylvania,* 319 U. S. 105 (1943) ; *Follett v. Town of McCormick,* 321 U. S. 573 (1944) ; *First Unitarian Church v. County of Los Angeles,* 357 U. S. 545 (1958) ; *Mayor and City Council of Baltimore v. A. S. Abell Co.,* 218 Md. 273, 145 A. 2d 111 (1958) ; Compare *Grosjean v. American Press Co.,* 297 U. S. 233, 250 (1936). Fear of constitutional restrictions is a proper consideration in a legislative exemption. See *Carmichael* at 513.

Apart from these considerations, there is today a generally recognized reason, entirely secular in nature, for the state to encourage the building and maintenance of houses of worship. Such edifices, and the activities carried on therein, may well be deemed to attract persons to communities and to tend to increase the general tax assessment base. Real estate developers are donating sites to churches in their planned communities as part of the efforts to attract purchasers.[4] Columbia, a city pro-

---

4. "The Danherst Corporation, which is building Fairless Hills (5,100 homes scheduled) * * * has donated four church sites based on surveys and studies and cleared through the Department of Research and Planning of the Philadelphia Council of Churches.

Levitt & Sons have donated 10 excellent sites to churches in Levittown (17,000 homes scheduled), in Bucks County, Pennsylvania. Levitt & Sons, themselves, chose the church sites and selected their donees.

Recently, Edmund N. Bacon, Executive Director of the Philadelphia City Planning Commission, incorporated 13 church sites in plans for the vast C-1 Housing Project for Northeast Philadelphia (15,000 homes proposed)." Halko, American City, March 1955, p. 7. See also, Leiffer, The Effective City Church, 126 (rev. ed. 1955).

jected to arise in Howard County between Baltimore and Washington, plans to have churches as well as supermarkets and office buildings as part of the community—obviously in the hope of attracting purchasers for the lots and houses. Anderson, *A Brand New City for Maryland,* Harper's Magazine, November, 1964. The Baltimore Urban Renewal and Housing Agency, whose goal is the prevention and elimination of blight and slums, has invited churches, with other community groups and institutions, to share in the formulation of plans for project areas.[5] The increase in the general tax base through the building of houses and apartment houses by persons attracted by the presence of a church in the neighborhood is a governmental motive in no way connected with the support or establishment of religion.[6] The object sought can not reasonably be deemed to be attainable with equal effect without the tax exemption of houses of worship.

We have found no case, federal or state, which holds that a tax exemption such as is here involved, confined to houses of worship, parsonages and the grounds appurtenant thereto and

---

5. See Baltimore Urban Renewal Commissioners statement of Jan. 8, 1960, "Policy of the Baltimore Urban Renewal and Housing Agency in its Relationship with Churches", reprinted in City Church, Sept./Oct. 1960, p. 13.

6. Church zoning cases which deal with the effect of permits for the building of houses of worship on immediately adjacent property are not here in point. For collections of and comments upon such zoning cases, see Curry, Public Regulation of the Religious Use of Land, 310-330 (1964) and cases therein cited. Note, Churches and Zoning, 70 Harv. L. Rev. 1428 (1957). Note, Church-State Religious Institutions and Values: A Legal Survey, 1958-59, 35 Notre Dame Law, 402, 405-11 (1960). The effect of the building of a church upon the values of adjacent property may be quite different from the stimulation to house buying and building in the community as a whole.

In Maryland, zoning laws generally permit the building of houses of worship in a residential zone without application for variance or special exception. Levy v. Seven Slade, Inc., 234 Md. 145, 154, 198 A. 2d 267 (1964—Baltimore County); Kaslow v. Rockville, 236 Md. 159, 165, 202 A. 2d 638 (1964—Rockville, Montgomery County). The Baltimore City Zoning Code does not exclude houses of worship and parsonages from the permitted uses in a residential area.

necessary therefor, violates the First Amendment or any other provision of the federal Constitution. Several cases, decided after *Everson*, have held to the contrary. *Lundberg v. County of Alameda*, 46 Cal. 2d 644, 654, 298 P. 2d 1, *appeal dismissed* for want of a substantial Federal question, *sub. nom. Heisey v. County of Alameda*, 352 U. S. 921 (1956), held that a provision of the California Revenue and Taxation Code granting a tax exemption to property used exclusively for school purposes of less than collegiate grade and owned by religious, hospital or charitable organizations, did not violate the "establishment" clause of the First Amendment. The court said:

> "* * * [I]t is apparent that the exemption was enacted to promote the general welfare through encouraging the education of the young and not to favor religion, since it is not limited to schools maintained by religious groups but applies also to those operated by other charitable organizations. Under the circumstances, any benefit received by religious denominations is merely incidental to the achievement of a public purpose."

The opinion also referred to the history of tax exemptions to religious institutions. In *General Finance Corp. v. Archetto*, 93 R.I. 392, 176 A. 2d 73 (1961), *appeal dismissed* for want of a substantial Federal question, 369 U. S. 423 (1961), a taxpayer contended that he was assessed at a higher rate because of a tax exemption for buildings used for religious purposes and that the exemption violated the First Amendment; the court held the exemption constitutional. See also *Sisters of Holy Cross v. Town of Brookline*, 347 Mass. 486, 497-98, 198 N. E. 2d 624 (1964) and *Fellowship of Humanity v. County of Alameda*, 153 Cal. App. 2d 673, 315 P. 2d 394 (1957).

We do not reach the question of whether, absent the tax exemption here involved, the taxation of church owned properties would violate the "free exercise" clause of the First Amendment. For the reasons set forth, we hold that the exemption does not violate the "establishment" clause, and is constitutional.

*Decree affirmed; costs to be paid by appellants.*