# FAIR LANES, INC. *v.* COMPTROLLER OF THE TREASURY OF THE STATE OF MARYLAND

[No. 304, September Term, 1971.]

*Decided April 12, 1972.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN and SMITH, JJ.

*Donald N. Rothman* and *Herbert Goldman,* with whom were *Gordon, Feinblatt & Rothman* on the brief, for appellant.

*Jon F. Oster, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The sole question in this appeal is whether the application of Maryland's chain store license tax, Code (1972 Repl. Vol.) Art. 56, § 57 (Laws of 1933, Ch. 542) for the license year 1970 against the appellant, Fair Lanes, Inc., including The Arundel Ice Cream Company (Arundel) and The English Company (English), as a single chain, is arbitrary, discriminatory and violative of the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States.

The basic facts are not in dispute. Fair Lanes, on May 21, 1970, paid, under protest, to the Clerks of the Circuit Courts of seven counties—Baltimore, Anne Arundel, Montgomery, Prince George's, Wicomico, Somerset and Dorchester—and to the Clerk of the Court of Common Pleas of Baltimore City, chain store license fees in the total amount of $6,683.00. The Miscellaneous Revenue Division of the State License Bureau, Comptroller of the Treasury (the Division), had assessed this chain store license fee against the 57 retail locations operated by Fair Lanes, Arundel and English as one chain and the payment, under protest, resulted from this assessment.

Fair Lanes, on July 16, 1970, filed petitions for refunds

in the seven counties mentioned and in Baltimore City for refunds in the total amount of $2,860.00 with interest at 6% per annum. The petitions for refund were based upon the contention by Fair Lanes that the license fees should have been assessed against Fair Lanes, Arundel and English, respectively, as three separate chains. Inasmuch as the license fees are progressive and are based upon the number of retail locations in the chain, the assessment as one chain, instead of three chains, resulted in a higher license fee to be paid by Fair Lanes. All of the petitions for the refund were denied and Fair Lanes took appeals to the Maryland Tax Court on the ground that Fair Lanes had been denied equal protection of the laws contrary to the provisions of the Fourteenth Amendment.

At the hearing on these appeals held before the Maryland Tax Court on April 14, 1971, Fair Lanes presented testimony to the effect that Fair Lanes was involved primarily in the operation of bowling centers. It had acquired all of the issued and outstanding capital stock of Arundel, which had been, and continues to be, engaged in the manufacture and sale of ice cream and in the operation of a group of snack bars, in 1968. Fair Lanes also acquired all of the issued and outstanding capital stock of English, which had been and continues to be engaged in the operation of a number of restaurants, in 1969. The Board of Directors of Fair Lanes, as the owner of the capital stock of both Arundel and English, selects the members of the Boards of Directors of Arundel and English. The only stock which the public may purchase is that of Fair Lanes.

Fair Lanes also offered testimony that, although there were some interlocking of officers and directors among the three companies, each company maintained a separate Board of Directors and officers. The day-to-day management of the retailing activities of each of the companies is independent from the others and is not run by the Board of Directors of the other companies. There are little or no inter-relationships in the conducting of

the respective retailing activities. The Treasurer of Fair Lanes testified that the three companies do no advertising in common; the three companies have separate business officers; they do not generally sell food or other items to or purchase food or other items from each other, one of the exceptions being that Arundel purchases chicken from English for 12 of its stores; they have separate managements and do not interchange operating personnel among themselves; they do not attempt to promote their common ownership in the eyes of the public; they derive no benefits from a centralized accounting system (which is being discontinued) ; they do not make bulk purchases or stockpile goods in common; they do not use common pricing policies; they have not standardized their management structures; they do not generally sell or promote the products or services of the other companies to the public; and, generally, they regard themselves as distinct and separate chains.

The Treasurer of Fair Lanes, however, admitted in answer to a question from the Chief Judge of the Maryland Tax Court that "the executive control of all the subsidiaries is in Fair Lanes." On May 1, 1970, the three companies had a central payroll account. Fair Lanes has a comptroller; Arundel and English do not have comptrollers. The same public accounting firm files the consolidated Federal Income Tax Returns for the three companies and separate State Income Tax Returns. All of the retail sales tax returns are prepared in the centralized comptroller's department "at the moment." The insurance for the three companies is maintained through the same insurance agency. When Arundel had problems with its operating heads, having had three prior operating officers, the chief operating officer of the bowling division of Fair Lanes was made chief executive officer of Arundel. The Treasurer of Fair Lanes characterized this arrangement as a "temporary assignment for about a year or a little over a year."

If the cash flow of either Arundel or English is not sufficient to provide the necessary capital funds for the

respective companies, Fair Lanes, as the parent company, would advance the necessary capital funds. Neither subsidiary would have the option to look elsewhere for its finances "because the financial part of the company is indeed centralized."

The Maryland Tax Court in the memorandum of the grounds for its decision (Fenneman, C. J.) denying the claims for refund indicated that in that court's opinion all three requirements of the applicable statute, *i.e.*, management, supervision and ownership, were centralized in Fair Lanes, which exercised a general executive power over all three corporations, even though their day-to-day operations were handled separately, and that the imposition of the tax by the Division did not deny Fair Lanes equal protection of the laws. We have concluded that the Tax Court's decision was correct and we will affirm its order of August 20, 1971, denying Fair Lanes' claims for refund.

Art. 56, § 57 provides in relevant part that:

> "Every person, firm, corporation, * * * opening, establishing, operating or maintaining two or more stores or mercantile establishments where goods, wares and/or merchandise are offered for sale at retail within this State, *under the same general management, supervision, or ownership,* shall pay the license fees * * *."
> (Emphasis supplied.)

This statutory provision was considered by our predecessors in *Read Drug & Chemical Co. v. Claypoole,* 165 Md. 250, 166 A. 742 (1933) in which the time of application of the license fee was decided, but in which it was not necessary to pass upon the constitutionality of the statute either generally or in its application in that case. It was pointed out, however, that the Supreme Court of the United States in *State Board of Tax Commissioners of Indiana v. Jackson,* 283 U. S. 527, 51 S. Ct. 540, 75 L. Ed. 1248 (1931) had held that the Indiana chain store

licensing act was constitutional. See also 112 A.L.R. 305, "Constitutionality of chain store tax," supplementing 85 A.L.R. 736 and 73 A.L.R. 1481.

Fair Lanes concedes, of course, that a state may exact license fees or taxes for the privilege of engaging in legitimate business under its taxing powers and that the state may classify occupations and property for this purpose so long as the classification is reasonable. If, however, the classification is arbitrary, it has been held by the Supreme Court of the United States to violate the equal protection clause of the Fourteenth Amendment. See, *e.g., Bell's Gap R. R. Co. v. Pennsylvania,* 134 U. S. 232, 10 S. Ct. 533, 33 L. Ed. 892 (1890) and *Barbier v. Connolly,* 113 U. S. 27, 5 S. Ct. 357, 28 L. Ed. 923 (1885).

Fair Lanes, however, earnestly contends that under the criteria set forth in *Jackson, supra,* there is an arbitrary and unreasonable classification applied by the State in regard to it and hence the action of the Division denies Fair Lanes the equal protection of the laws.

In its analysis of the majority opinion in *Jackson,* Fair Lanes has found 16 characteristics of chain store management and operation which were deemed to be sufficient to justify the State in classifying chain stores differently from single stores or department stores for license tax purposes. It concedes, however—as indeed it must—that it is not necessary for all of the 16 characteristics present in *Jackson* to exist in order to justify a different and valid classification. Mr. Justice Roberts, for the majority of the Supreme Court, made this clear when he stated:

> "* * * The power of taxation is fundamental to the very existence of the government of the States. The restriction that it shall not be so exercised as to deny to any the equal protection of the laws does not compel the adoption of an iron rule of equal taxation, nor prevent variety or differences in taxation, or discretion in the selection of subjects, or the classification

for taxation of properties, businesses, trades, callings, or occupations * * *."
* * *
"It is not the function of this Court in cases like the present to consider the propriety or justness of the tax, to seek for the motives or to criticize the public policy which prompted the adoption of the legislation. Our duty is to sustain the classification adopted by the legislature if there are substantial differences between the occupations separately classified. *Such differences need not be great.* The past decisions of the Court make this abundantly clear." (Emphasis supplied.)
(283 U. S. at 537-38, 51 S. Ct. at 543, 75 L. Ed. at 1255-56.)

The trend in the opinions of the Supreme Court of the United States since the 1931 opinion in *Jackson* has been toward sustaining the power of the States to make valid classifications for purposes of taxation against attacks based upon the Fourteenth Amendment prohibition of a denial of equal protection of the laws. See, *e.g., Allied Stores of Ohio v. Bowers,* 358 U. S. 522, 79 S. Ct. 437, 3 L.Ed.2d 480 (1959) and cases therein cited; *Walters v. City of St. Louis,* 347 U. S. 231, 74 S. Ct. 505, 98 L. Ed. 660 (1954) ; *New York Rapid Transit Corp. v. City of New York,* 303 U. S. 573, 58 S. Ct. 721, 82 L. Ed. 1024 (1938) ; *Carmichael v. Southern Coal & Coke Co.,* 301 U. S. 495, 57 S. Ct. 868, 81 L. Ed. 1245 (1937) ; *Great Atlantic & Pacific Tea Co. v. Grosjean,* 301 U. S. 412, 57 S. Ct. 772, 81 L. Ed. 1193, *rehearing denied,* 302 U. S. 772, 58 S. Ct. 3, 82 L. Ed. 599 (1937). See also 51 Am. Jur. *Taxation,* § 167-69, at 222-25.

As Mr. Justice Jackson stated for the Supreme Court in *Walters v. City of St. Louis, supra:*

"The power of the State to classify according to occupation for the purpose of taxation is broad. Equal protection does not require iden-

tity of treatment. It only requires that classification rest on real and not feigned differences, that the distinction have some relevance to the purpose for which the classification is made, and that the different treatments be not so disparate, relative to the difference in classification, as to be wholly arbitrary. Cf. *Dominion Hotel, Inc. v. Arizona,* 249 U. S. 265; *Great Atlantic & Pacific Tea Co. v. Grosjean,* 301 U. S. 412; *New York Rapid Transit Corp. v. City of New York,* 303 U. S. 573; *Skinner v. Oklahoma ex rel. Williamson,* 316 U. S. 535. 'In its discretion it may tax all, or it may tax one or some, taking care to accord to all *in the same class* equality of rights.' *Southwestern Oil Co. v. Texas,* 217 U. S. 114, 121. It may even tax wholesalers of specified articles on account of their occupation without exacting a similar tax on the occupations of wholesale dealers in other articles. Our disapproval of the wisdom or fairness of so doing is not a ground for interference. *Ibid.* 'When a state legislature acts within the scope of its authority it is responsible to the people, and their right to change the agents to whom they have entrusted the power is ordinarily deemed a sufficient check upon its abuse. When the constituted authority of the State undertakes to exert the taxing power, and the question of the validity of its action is brought before this court, every presumption in its favor is indulged, and only clear and demonstrated usurpation of power will authorize judicial interference with legislative action.' *Green v. Frazier,* 253 U. S. 233, 239."
(347 U. S. at 237-38, 74 S. Ct. at 509-10, 98 L. Ed. at 665-66.)

We observe that Fair Lanes in the present case does not direct our attention to any other business operation indicating any alleged palpable discrimination and de-

nial of the equal protection of the laws as was urged upon the Supreme Court (unsuccessfully) in *Great Atlantic & Pacific Tea Co. v. Grosjean, supra.* It is not necessary that this be done as there have been challenges to the constitutionality of a chain store license tax where the chain store attacking the tax did not point to any other particular business operation as receiving favored or preferential treatment. See, *e.g., Interco, Inc. v. Rhoden,* 220 So. 2d 290 (Miss. 1969), *appeal dismissed,* 90 S. Ct. 26, 396 U. S. 7, 24 L.Ed.2d 7 (1969) ; *State v. Paramount-Gulf Theatres,* 226 Miss. 404, 84 So. 2d 403 (1956); *Standard Oil Co. v. State Board of Equalization,* 110 Mont. 5, 99 P. 2d 229 (1940) ; *State v. Kutcher,* 68 S. D. 366, 2 N.W.2d 669 (1942).

In our opinion, the State taxing authorities could properly assess Fair Lanes for tax purposes as a chain store or integrated company because the sum of advantages, opportunities and powers it had as one company are greater than those available to three separate and independent companies. Fair Lanes has the advantage of being able by its ownership and executive control to move executives from one company to another when circumstances demand special executive skills. This was actually done by the transfer of the chief of the bowling division of Fair Lanes to be executive officer of Arundel after "a succession of three operating officers" prior to his transfer. Fair Lanes has the advantage of having greater capital resources which may be employed in its subsidiary companies, used, for example, in the construction and leasing of a new branch of Arundel in Prince George's County. Fair Lanes also has the advantage of centralizing business functions requiring specialized knowledge. The retailing activities of the three companies are not so different that Fair Lanes is not able to use certain management techniques and expertise that are interdependent and are interrelated to the success of each of the three companies and Fair Lanes as an integrated company. Fair Lanes could well use its management techniques and expertise to gauge and evaluate the

public's tastes, trends and consumption of certain foods and its interest in leisure activities; to determine and evaluate population growth or decline in various areas as indicative of the probabilities in regard to future sales; the ability to determine the location of advantageous sites for outlets and the solution of traffic, zoning and construction problems, as well as making provision for construction financing; and, to deal more effectively with problems of labor-management relations, to name a few which come to mind.

Our predecessors stated the purpose of § 57 in *Read Drug and Chemical Co.*, *supra*, as follows:

"* * * to exact an additional license fee for the privilege of engaging in the 'chain store' business, by reason of the advantages such a method of conducting business has over the individual operator, thereby rendering more equal competition and also deriving additional revenue for the State. It is evident that the Legislature concluded that, as the number of stores or mercantile establishments in the chain increased there was a corresponding increase in the advantages secured."

(165 Md. at 258, 166 A. at 746.)

The advantages obtained by Fair Lanes by the greater quality, expertise and experience of its management, as well as its ownership and supervision of Arundel and English, bring Fair Lanes within the language and purpose of § 57 and support the order of the Maryland Tax Court sustaining the ruling of the Comptroller in denying the refunds and holding that there was no denial of the equal protection of the laws under the Fourteenth Amendment.

*Order of August 20, 1971, affirmed, the appellant to pay the costs.*