## AERO MOTORS, INC., ET AL. *v.* ADMINISTRATOR, MOTOR VEHICLE ADMINISTRATION ET AL.

[No. 105, September Term, 1974.]

*Decided May 6, 1975.*

568

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Ronald J. Kearns,* with whom were *Ginsberg & Ginsberg* on the brief, for appellants.

*Joseph P. Carroll, Special Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *J. Michael McWilliams, Assistant Attorney General,* on the brief, for Administrator, Motor Vehicle Administration, part of appellees and *Stephen C. Winter,* with whom were *White, Mindel, Clarke & Hill* on the brief, for Automobile Trade Association of Maryland, other appellee.

O'DONNELL, J., delivered the opinion of the Court. ELDRIDGE, J., concurs in the result.

The appellants, Aero Motors, Inc., and seven other Maryland licensed used car dealers joined forces and filed a bill of complaint in the Circuit Court for Baltimore County, pursuant to the provisions of Maryland Code (1957, 1971 Repl. Vol.) Art. 31A (Uniform Declaratory Judgments Act),[1] joining as defendants the Administrator of the Motor Vehicle Administration and the Automobile Trade

---

1. Now codified in Maryland Code (1974) Courts and Judicial Proceedings Article Title 3, Subtitle 4 (§§ 3-401 to 3-415).

Association of Maryland and sought a decree declaring Code (1957, 1970 Repl. Vol.) Art. 66½, § 3-113.1, to be unconstitutional and enjoining the defendants from applying and enforcing the statute.

The statute reads as follows:

### "§ 3-113.1. Manufacturer's certificate of origin; dealer to hold franchise.

(a) Any manufacturer transferring a new vehicle to a dealer shall supply the dealer, at the time of the transfer, with a manufacturer's certificate of origin. Any dealer transferring a new vehicle to another dealer, at the time of the transfer, shall give the transferee the proper manufacturer's certificate of origin assigned to the transferee, and each dealer shall hold an unexpired franchise in this State for the particular make of vehicle.

(b) Every dealer who holds a new vehicle for sale shall hold an unexpired franchise in this State for the particular make of vehicle held."

At the commencement of the trial before Judge H. Kemp MacDaniel the parties stipulated that: the Maryland Legislature (a) has authority to enact regulatory measures governing the sale of new and used automobiles, (b) has authority under its police power to regulate the sale of motor vehicles for the protection and general welfare of the public, (c) that the production, transportation and marketing of automobiles is a proper subject for regulation by the Legislature under its police power, and (d) that the right of a manufacturer of automobiles to choose its dealers is the right of the freedom of contract.

As the centrum of the appellants' assault upon the statute is the fact that under it new car dealers holding unexpired franchises from manufacturers are permitted to transfer new vehicles for which they hold a franchise to another dealer having a franchise from the same manufacturer by the use of the manufacturer's "certificate of origin," and that such transfers are thus exempt from the 4 percent

excise tax imposed under Art. 66¹/₂, § 3-831 (a), which is collected upon the issuance of every original certificate of title for a motor vehicle, as well as the certificate of title fee prescribed in § 3-830, whereas they, as used car dealers, must in connection with the purchase of such a new motor vehicle, like the purchasing public, obtain a certificate of title as required by Art. 66¹/₂, § 3-101, and in accordance with the procedure specified in § 3-104 (b) and § 3-113 (c), which such transaction is subject to both the payment of the certificate of title fee ($2) and the excise tax computed on the "fair market value" of the vehicle.

The appellants established by testimony that although the same criteria is used, under § 5-102 and § 5-103, for the issuance of dealers' licenses — whether for new or used cars — the issuance of such a license for new cars is predicated upon no other requirement under § 5-105 than the possession by the applicant of an unexpired franchise from a motor vehicle manufacturer — each establishing its own standards for the granting of franchises, which standards may differ between manufacturers and by the same manufacturer in different locales.

Acknowledging that used vehicles may be transferred under the provisions of § 3-113 (b) from one registered dealer to another registered dealer without applying for a new certificate of title — nor any payment of the excise tax — by merely executing an assignment of the title outstanding for such vehicle, appellants complain that although a dealer possessing a license to deal in new vehicles may sell not only new cars obtained from another franchised dealer without the payment of the excise tax, and used cars as well, the used car dealer cannot sell new cars without the issuance of a certificate of title and the payment of the tax.

The used car dealers all testified that they did not perform warranty work and, indeed, in the case of a car still in warranty, could not be reimbursed by the manufacturer for any such services performed. None of them possessed the facilities for performing "heavy" mechanical work on automobiles although several of them employed one or two

mechanics for performing "light" service work in preparing vehicles for sale and in connection with warranties issued by them as dealers.

By way of counter thrust the appellees elicited testimony that the modern automobile, an extremely complex mechanical device, becomes more sophisticated with each model-year and that the average individual possesses little or no mechanical knowledge concerning its intricacies; that the new car warranty issued by and binding upon the manufacturer — a copy of which is filed with the Motor Vehicle Administration — is transferable during the period of its applicability and in the mind of the public has become one of the most essential ingredients in connection with the sale of new automobiles. Since new car dealerships are the only service facilities authorized by the manufacturer to perform such warranty work — often to correct mistakes and maladjustments by the manufacturer — and for which such dealerships are reimbursed, the purchasing public must rely on the facilities and expertise of such dealerships to service their new cars. Such franchise dealers must equip themselves not only with the regular tools, but such special tools and devices as may be needed for a particular make of automobile, including those for compliance with antipollution requirements, some of which cost between $5,000 and $6,000. The manufacturers require not only that their dealers maintain a certain inventory of parts and accessories, but that a certain number of their mechanical personnel be trained in factory operated schools and from time to time attend retraining sessions in order that they may be continually apprised of mechanical changes as new models are marketed. By way of contrast, used car dealers are not only unauthorized to perform such warranty work, but generally are ill-equipped by way of personnel, tools, equipment and facilities to perform the specialized mechanical services needed on new automobiles.

It was uncontradicted that franchises are not easy to come by; that one seeking such a franchise must first have a location where a manufacturer feels the need for a

dealership. The applicant must demonstrate the possession of sufficient financial resources to meet the manufacturer's capital requirements and maintain a certain "net worth" which is designed primarily for the benefit and protection of the consuming public, but permits, as well, the acquisition and maintenance by the new car dealers of the latest necessary equipment with which to service new vehicles.

Although the manufacturers exercise no control whatsoever as to whom a dealer may sell a new car, they insist upon the maintenance of certain standards for dealer operation and conduct which they generally supervise. From time to time it may be necessary for such franchise dealers to move to a new location, to build larger physical facilities or to install additional service "bays."

It was additionally developed in the testimony that if a licensed new car dealer purchased a new vehicle from a dealer operating under a franchise of a different manufacturer he — just as the used car dealers — would be required to have a certificate of title issued and to pay the excise tax due thereon.

It was upon these facts that the appellants in the trial court contended — as they do here — that Art. $66^{1}/_{2}$, § 3-113.1, (1) violates the "equal protection clause" of the Fourteenth Amendment to the United States Constitution in that it is: (i) class legislation, (ii) an arbitrary exercise of the police power, and (iii) tends to create a monopoly, an invalid basis for classification; (2) violates the "due process clause" of the Fourteenth Amendment of the United States Constitution, and is in violation of Article 23 of the Maryland Declaration of Rights; and (3) constitutes an improper and unlawful delegation of the legislative power of the state to the manufacturers of motor vehicles and their franchise dealers.

From an order declaring the statute to be constitutional and denying the injunctive relief sought, the appellants entered an appeal to the Court of Special Appeals. Since at the time of the entry of the appeal the subject matter was not within the jurisdiction of that court, see Code (1974),

574

Courts and Judicial Proceedings Article § 12-308, we ordered the case transferred to the docket of this Court in accordance with Maryland Rule 814.

(1)

"There is no question, of course, that a classification made by a Legislature is presumed to be reasonable in the absence of clear and convincing indications to the contrary, and the person who assails it has the burden of showing that it does not rest upon any reasonable basis but is essentially arbitrary." *Tatelbaum v. Pantex Mfg. Corp.*, 204 Md. 360, 370-71, 104 A. 2d 813, 820 (1954), citing *Lindsley v. Natural Carbonic Gas Co.*, 220 U. S. 61 (1911) and *Salsburg v. State*, 201 Md. 212, 94 A. 2d 280 (1953), *aff'd* 346 U. S. 545 (1954).

In *Adm'r, Motor Vehicle Adm'n v. Vogt*, 267 Md. 660, 299 A. 2d 1 (1973), this Court sustained the constitutionality of Art. 66¹/₂, § 5-203 (d), imposing a $5.00 assessment against automobile wreckers, against an attack by them that the statute constituted an invidious discrimination between wreckers and scrap processors, who were not subject to the assessment, and that the dissimilar treatment rendered the classification arbitrary, with no resultant reasonable relationship to the legislation. In denying the appellees' contention that they were denied "equal protection" the Court applied the "reasonable basis" test enunciated in *Lindsley v. Natural Carbonic Gas Co., supra.* Judge Levine, in writing for the Court, stated:

> "One of the leading cases decided by the Supreme Court on this issue is *Lindsley v. Natural Carbonic Gas Co.*, 220 U. S. 61, 31 S. Ct. 337, 55 L. Ed. 369 (1911), which this Court has cited with approval on more than one occasion. Referring to a contention similar to that advanced by appellees, the Court there said:
>
>> 'The rules by which this contention must be tested, as is shown by repeated decisions of this court, are these:
>>
>> '1. The equal protection clause of the

Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a *wide scope of discretion* in that regard, and avoids what is done only when it is without *any* reasonable basis and therefore is purely arbitrary.

'2. A classification having *some* reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in *some* inequality.

'3. When the classification in such a law is called in question, *if any state of facts reasonably can be conceived* that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed.

'4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary. (citations omitted)' 220 U. S. at 78-79 (all emphasis added).

While more than sixty years have passed since that decision, in the course of which many cases have been decided on the same issue, the principles enunciated there have lost none of their vitality." 267 Md. at 671-72, 299 A. 2d at 6-7.

In applying the *Lindsley* test to the facts he concluded for the Court:

"Contrary to appellees' claim, we think that the legislature's classification of wreckers and scrap processors in different categories with resulting differences in their treatment was reasonable rather than arbitrary. As we noted earlier, a cardinal rule to be observed in determining whether a statute is violative of the Equal Protection Clause is that the legislature exercises a broad scope of discretion in establishing classifications, subject

only to the requirement of reasonableness in doing so. *Dandridge v. Williams,* 397 U. S. 471, 90 S. Ct. 1153, 25 L.Ed.2d 491 (1970); *McGowan v. Maryland,* 366 U. S. 420, 81 S. Ct. 1101, 6 L.Ed.2d 393 (1961); *Royster Guano Co. v. Virginia* [253 U. S. 412 (1920)]; *Lindsley v. Natural Carbonic Gas Co.,* both *supra; Potomac Sand & Gravel v. Governor,* 266 Md. 358, 293 A. 2d 241 (1972); *Allied American Co. v. Comm'r,* 219 Md. 607, 150 A. 2d 421 (1959)." 267 Md. at 676-77, 299 A. 2d at 9.

The more traditional "reasonable basis" test, sometimes termed the "rational relationship" or "fair and substantial relationship" tests, concerning this type of legislative enactment has been consistently applied by this Court. *See Wampler v. LeCompte,* 159 Md. 222, 225, 150 A. 455, 457 (1930); *Md. Coal & Realty Co. v. Bureau of Mines,* 193 Md. 627, 638-39, 69 A. 2d 471, 475 (1949); *Tatelbaum v. Pantex Mfg. Co., supra; Allied American Co. v. Comm'r,* 219 Md. 607, 623, 150 A. 2d 421, 431 (1959); *Creative School v. Board,* 242 Md. 552, 571-72, 219 A. 2d 789, 799-800 (1966); *Director v. Daniels,* 243 Md. 16, 49-50, 221 A. 2d 397, 417 (1966); *Rebe v. State's Attorney,* 262 Md. 350, 355, 277 A. 2d 616, 618 (1971); *Potomac Sand & Gravel v. Governor,* 266 Md. 358, 376-77, 293 A. 2d 241, 250-51, *cert. denied,* 409 U. S. 1040 (1972); *Salisbury Beauty Schools v. State Board,* 268 Md. 32, 59-60, 300 A. 2d 367, 383-84 (1973); and *Maryland St. Bd. of Barber Examiners v. Kuhn,* 270 Md. 496, 507, 312 A. 2d 216, 222 (1973).

Since the statute here involved sets up no "suspect classification," based on race, alienage, nationality, legitimacy, etc., or affects any fundamental right, such as the right to vote, to speak or to assemble, to travel, to bear children, etc., those cases cited by the appellants urging the application of the "close scrutiny test" are inapposite.

As Judge Levine stated for this Court in *Maryland St. Bd. of Barber Examiners v. Kuhn, supra:*

"In cases brought under the Equal Protection Clause of the Fourteenth Amendment, but not

involving so-called 'suspect classifications' or 'fundamental personal rights,' the Supreme Court and this Court have applied the more traditional 'rational relationship' or 'fair and substantial relation' tests, which require, at a minimum, that a statutory classification bear some 'rational relationship' to a legitimate state purpose, *Weber v. Aetna Casualty & Surety Co., supra* [406 U. S. 164 (1972)]; *Morey v. Doud,* 354 U. S. 457, 463-64, 77 S. Ct. 1344, 1 L. Ed. 2d 1485 (1957); *Dasch v. Jackson,* 170 Md. 251, 265, 183 A. 534 (1936); *see Hearst Corp. v. St. Dep't of A. & T.,* 269 Md. 625, 644, 308 A. 2d 679 (1973) (dictum); *cf. City of Balto. v. Charles Ctr Parking,* 259 Md. 595, 598, 271 A. 2d 144 (1970); or that the legislative classification rest upon some ground of difference having a fair and substantial relation to the object of the legislation, *Reed v. Reed,* 404 U. S. 71, 92 S. Ct. 251, 30 L. Ed. 2d 225 (1971); *Schilb v. Kuebel, supra* [404 U. S. 357 (1971)]; *McDonald v. Board of Election,* 394 U. S. 802, 89 S. Ct. 1404, 22 L. Ed. 2d 739 (1969); *McGowan v. Maryland,* 366 U. S. 420, 81 S. Ct. 1101, 6 L. Ed. 2d 393 (1961); *Adm'r, Motor Veh. Adm. v. Vogt,* 267 Md. 660, 677, 299 A. 2d 1 (1973)." 270 Md. at 507, 312 A. 2d at 222.

"Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have relevance to the purpose for which the classification is made." *Baxstrom v. Herold,* 383 U. S. 107, 111 (1966). As we stated in *Salisbury Beauty Schools v. State Bd., supra:*

"If all persons who are in like circumstances or affected alike are treated under the laws the same, there is no deprivation of the equal protection of the law. Conversely, a law which operates upon some persons or corporations, and not upon others like situated or circumstanced or in the same class is invalid. See *Oursler v. Tawes,* 178 Md. 471, 483,

578

13 A. 2d 763, 768 (1940); *Leonardo v. Board of County Commissioners*, 214 Md. 287, 304, 134 A. 2d 284, 292 (1957), *cert. denied* 355 U. S. 906, 78 S. Ct. 332, 2 L.Ed.2d 260, *rehearing denied* 355 U. S. 967, 78 S. Ct. 534, 2 L.Ed.2d 543; *National Can Corp. v. State Tax Commission*, 220 Md. 418, 431, 153 A. 2d 287, 295 (1959), *appeal dismissed* 361 U. S. 534, 80 S. Ct. 586, 4 L.Ed.2d 538." 268 Md. at 60, 300 A. 2d at 383-84.

The appellants, by stipulation, concede that it is within the police power of the state, for the protection and general welfare of the public, to regulate the production, transportation and marketing of automobiles — whether they be new or used. The main thrust of their "equal protection" argument is that the classification, between new and used car dealers, is dependent solely upon the issuance of a franchise by an automobile manufacturer — upon criteria established by such manufacturer — and that the distinction in the classifications thus rests on an arbitrary rather than a reasonable basis in the exercise of the police power.

The distinction between new and used automobiles as salable commodities has long been recognized by our Legislature; such vehicles are separately defined. *See* Art. 66½, § 1-152 ("new vehicle") and § 1-208 ("used motor vehicle"). The public safety aspects of the differentiation are emphasized by the provisions of §§ 13-105 and 13-106 requiring a certificate of inspection for the equipment and mechanisms of a used motor vehicle before a certificate of title can be issued.

For over 25 years the General Assembly has required dealers to be licensed by the Motor Vehicle Administration, *see* Art. 66½, § 5-101, *et seq.*; for an equal period of time special requirements for licenses to deal in new vehicles have been in existence. *See* Art. 66½, § 5-105. Whereas § 5-108 requires every licensed dealer to post bond in the penalty of $15,000, § 3-113.3, as now amended, requires every manufacturer transferring a new Class A motor

vehicle to a dealer, pursuant to the provisions of § 3-113.1, to post a surety bond in the penalty of up to $300,000 "for the use and benefit of the [Motor Vehicle] Administration, a dealer, and the public who may suffer or sustain any loss by reason of the breach of any manufacturer's express or implied warranty in the sale of a Class A motor vehicle by a dealer." Additionally, the section makes every manufacturer jointly and severally liable, with the dealer, to the purchaser of such a new vehicle for the breach of any warranty. As recently as 1972 the General Assembly, in enacting Ch. 544 of the Acts of 1972, adding a new subheading to Art. 66½, entitled "Part VII — Manufacturers, Distributors and Factory Branches" (now codified as §§ 5-701 to 5-709 inclusive) declared as a preamble to the enactment that "the distribution and sale of Class A and Class B vehicles in the State of Maryland vitally affects the general economy of the state and the public interest and the public welfare," and further declared "that it is necessary to regulate and to license distributors, factory branches and manufacturers engaged in the sale or distribution of Class A and Class B vehicles in the State of Maryland in order to prevent frauds, discrimination and other abuses upon the citizens of the State of Maryland, in order to foster vigorous and healthy competition, to prevent the creation or perpetuation of monopolies and to promote the public safety and welfare." The 1972 statute continued to recognize the existence of franchise agreements and in its statutory scheme requires the manufacturer to pay an annual license fee, to file a copy of its new motor vehicle warranty with the Administration and authorizes the suspension or revocation of any such license upon a failure to comply with its warranty agreement.

The motor vehicle is a constantly changing product; each new model brings innovations and in many instances mechanical problems. The franchised dealer maintains the customers' good will and at the same time maintains the good will of the franchisor in its trade-mark, trade name or franchised vehicle. It is only through such franchise dealers that the purchasing public has resort to rectify

manufacturing errors which mandate vehicle recalls in accordance with regulations of the national Department of Transportation.[2]

The uncontroverted evidence offered in the trial court established that the new car customer, in order to protect his investment in a complex necessity of modern life, is required to rely upon the warranty issued by the manufacturer of the vehicle which can only be gratified through one of its franchised dealers who, unlike used car dealers, are required to possess the necessary expertise and to supply and maintain the proper tools, devices and equipment, including specially trained mechanics, in order to perform the services within the warranty of a particular make or model of car. The supervision exercised by the manufacturers over their franchised dealers, their insistence upon sufficient financial resources and the maintenance of a certain "net worth," together with the manufacturers' responsibility — with the dealer — assures a new car customer of a level of fiscal responsibility as a recourse in the event of dissatisfaction.

As we stated in *Salisbury Beauty Schools, supra*:

> "If any state of facts reasonably can be conceived that would sustain the constitutionality of the statute within the exercise of the police power, the existence of that state of facts as a basis for the passage of the law must be assumed. *Gino's v. Baltimore City*, 250 Md. 621, 637, 244 A. 2d 218, 227 (1968); *Eutaw Enterprises v. Baltimore City*, 241 Md. 686, 693, 217 A. 2d 348, 353 (1966)." 268 Md. at 49, 300 A. 2d at 378.

In the absence of any legislative history, it must be assumed that the General Assembly, in enacting § 3-113.1, was aware of that state of facts as elicited in the trial court as a basis for the passage of the statute and did so in order to insure fiscal responsibility in connection with the

---

2. *See* Practicing Law Institute, Business and Legal Problems of Auto Dealers, at 19 (4th Annual Institute, New York City, 1972).

relationship between new car dealers and the purchasers of a manufacturer's vehicle and to guarantee to the purchaser a fulfillment of the terms of the warranty issued by the manufacturer. The equal protection clause is offended only if the classification is shown to rest on grounds wholly irrelevant to the achievement of the objective of the Legislature. *See Montgomery County, Maryland v. Walsh*, 274 Md. 502, 336 A. 2d 97, citing *McGowan v. Maryland*, 366 U. S. 420 (1961).

Under the statute new car dealers who possess a franchise from the same manufacturer may, *inter sese*, transfer a new vehicle upon the manufacturer's certificate of origin, with the certificate of title being issued to the retail purchaser. If a new car dealer transfers a new vehicle to a dealer holding a franchise from a different manufacturer he must, just as the used car dealer is required to do, obtain a certificate of title. The used car dealers may transfer used vehicles, *inter sese*, upon an assignment of the outstanding certificate of title without being required to apply for a new title. Thus, it appears that all dealers in like circumstances are affected alike and to this extent there is no deprivation to the used car dealers of equal protection under the law.

Based upon the criteria laid down in *Lindsley v. Natural Carbonic Gas Co., supra,* as applied in our cases, we find the classification not to be arbitrary but, based on the wide scope of discretion vested in the Legislature, predicated upon a reasonable basis.

In *Louisiana Motor Vehicle Comm'n v. Wheeling Frenchman*, 235 La. 332, 103 So. 2d 464 (1958), the Supreme Court of Louisiana, in upholding the constitutionality of a statute limiting the sale of new and unused motor vehicles to dealers holding a bona fide contract or franchise with a manufacturer or distributor of new and unused motor vehicles, pointed out that:

> "[T]he production, transportation and marketing of automobiles is unquestionably a proper subject for regulation by the Legislature under its police power. Motor vehicles are economic necessities in

modern living and with the strides which have been made in horsepower of engines, electrical and other equipment essential to present day traffic conditions, the automobile is a complicated device and the average citizen who owns one has little, if any, knowledge of its mechanical operation. Consequently, he necessarily must rely upon the representation and warranty of the manufacturer, furnished through a responsible dealer, for the servicing of his car. In the past, new and unused cars were sold to the public exclusively by franchised dealers under direct contract with and under the rules and regulations required by the manufacturer. But, today, as the result of aggressive competition existing between dealers to capture public favor with their particular product and the large output of the manufacturers, many new and unused cars are sold by second-hand or 'used car lot' dealers who are not always financially responsible and thus create an ever increasing hazard to the buying public. It is evident, therefore, that it was to curtail this hazard, aside from all other reason stated in R.S. 32:1251, that the Legislature enacted the statute now under consideration. Undoubtedly, this was the underlying purpose for the provision that, in order for one to qualify as a dealer of new or unused vehicles, he be required to present with his application a copy of his franchise or contract with a manufacturer or distributor entitling him to distribute and sell the new and unused vehicles of such manufacturer. Indeed, it is to be presumed that the Legislature had good grounds for prescribing that only a person holding a franchise from a manufacturer or distributor of a particular make or kind of motor vehicle is qualified to sell it as a new and unused car . . . ." 235 La. at 344-46, 103 So. 2d at 469.

In rejecting the appellees "equal protection" argument that court stated:

"This Court has long ago recognized that the placing of new and unused car dealers in a separate status from those persons who sell used automobiles is not an unreasonable classification or beyond the scope of legislative regulation under the police power.

In State v. Rogers, 148 La. 653, 87 So. 504, 507, it was contended, in a criminal prosecution for selling a second-hand automobile without evidencing the sale by an authentic act, as required by Act 193 of 1920, that the statute was unconstitutional because it excepted from its provisions every licensed dealer or agent in possession of a new or unused automobile for sale for the first time. The Court rejected this argument and, observing that the equal protection clause does not prohibit any and every discrimination in the law but only such a discrimination as would be arbitrary and without good reason, declared that 'The reason for exempting a licensed dealer or agent selling a new or unused car is that his license implies responsibility, and his offering for sale a new or unused car could not possibly give rise to suspicion with regard to his title.' " 235 La. at 349, 103 So. 2d at 470.

The Supreme Court of South Dakota reached a similar result in *In re Hinesley,* 82 S. D. 552, 150 N.W.2d 834 (1967), when it upheld the constitutionality of the statute that provided: "That if the applicant desires to sell, solicit, or advertise the sale of new and unused motor vehicles, he must have a bona fide contract or franchise in effect with the manufacturer or distributor of the motor vehicle, or motor vehicles, he proposes to deal in." After pointing out that the legislature, beyond question, had authority under the police power to regulate the sale of motor vehicles for the protection and general welfare of the public, that court, in rejecting the used car dealer's contention of a denial of "equal protection," stated:

"In adopting regulatory measures affecting the sale of motor vehicles 'the legislature may properly differentiate between dealers in new vehicles and dealers in used vehicles', 7 Am.Jur.2d, Automobiles and Highway Traffic, § 29, p. 619, also see Ring v. Mayor and Council of Borough of N. Arlington, 136 N.J.L. 494, 56 A.2d 744, aff. 1 N.J. 24, 61 A.2d 508 and 420 Broad Ave. Corp. v. Borough of Palisades Park, 137 N.J.L. 527, 61 A.2d 23. In considering whether an Oklahoma law regulating the practice of optometry violated the Equal Protection Clause of the Fourteenth Amendment by subjecting opticians to the regulatory system and exempting sellers of ready-to-wear glasses the U. S. Supreme Court said 'The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Tigner v. State of Texas, 310 U.S. 141, 60 S.Ct. 879, 84 L.Ed. 1124. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. Semler v. State Board of Dental Examiners, 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086. The legislature may select one phase of one field and apply a remedy there, neglecting the others. A. F. of L. v. American Sash Co., 335 U.S. 538, 69 S.Ct. 258, 93 L.Ed. 222. The prohibition of the Equal Protection Clause goes no further . than the invidious discrimination.' Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563." 82 S. D. at 556-57, 150 N.W.2d at 836.

We find the holdings in *Joyner v. Centre Motor Co.*, 192 Va. 627, 66 S.E.2d 469 (1951), relied on by the appellants in support of their contention that the statute makes an arbitrary classification, to be distinguishable. In *Joyner* the Virginia statute made it unlawful "for any motor vehicle

dealer to sell or offer for sale any new motor vehicle unless he shall have a written contract or franchise with the manufacturer or authorized distributor or dealer of that particular make of motor vehicle." The appellee possessing no such contract or franchise was denied a license to sell new vehicles, although he possessed a well-equipped establishment, salesroom and repair shop — found to be more adequate and better than those of the average franchised dealer. That court found that the statute created an "exclusive right, privilege or immunity" in violation of the Virginia Constitution proscribing the enactment of any such "special or private law" and that it created an "arbitrary separation" between automobile dealers in that the statute was "intended and designed to prevent the perpetration of frauds upon and to the detriment of the public at large," and there was no reasonable basis for distinguishing the integrity and honesty, or the lack of those virtues, between unenfranchised dealers as a class and those holding franchises.

Nor, as we see it, does § 3-113.1 provide an invalid basis for classification by tending to create a monopoly. In *Levin v. Sinai Hosp.*, 186 Md. 174, 46 A. 2d 298 (1946), Judge Delaplaine wrote for this Court:

> "A monopoly is more than a mere privilege to carry on a trade or business or to deal in a specified commodity. It is an exclusive privilege which prevents others from engaging therein. A grant of privileges, even though monopolistic in character, does not constitute a monopoly in the constitutional sense when reasonably required for protection of some public interest, or when given in return for some public service, or when given in reference to some matter not of common right. *Raney v. Montgomery County Commissioners*, 170 Md. 183, 183 A. 548; *Goldsmith v. Mead Johnson & Co.*, 176 Md. 682, 7 A. 2d 176; 125 A.L.R. 1339." 186 Md. at 183, 46 A. 2d at 302.

As pointed out in *Grempler v. Multiple Listing Bureau,*

258 Md. 419, 430, 266 A. 2d 1, 7 (1970), unfair competition laws are designed to protect the public, not primarily to protect individual plaintiffs. Title 15 U.S.C.A. §§ 1221-1225 give recognition to the franchise system in connection with the sale of automobiles by franchised dealers and provide for remedies in cases of bad faith conduct on the part of manufacturers in connection with such franchises.

Notwithstanding the protective nature of our statutes (*see* Code (1957, 1975 Repl. Vol.) Art. 83) and of federal antitrust and fair practice laws (*see Federal Trade Comm'n v. Brown Shoe Co.*, 384 U. S. 316, 321 (1966)), the appellants have pointed to no federal or state statute or regulation which supports their contention that the arrangement created by § 3-113.1 tends to create an illegal "monopoly."

This same contention, raised in *Louisiana Vehicle Comm'n v. Wheeling Frenchman, supra*, was there rejected by the Supreme Court of Louisiana when it stated:

> "[W]e fail to see how such provisions tend to create monopolies or operate unreasonably to the advantage of only a favored few. We think it too plain for extended discussion that the numerous automobile dealers engaged in the business of selling new and unused cars in this State under franchises from various domestic and foreign manufacturers have no monopoly which creates a restraint of trade to the public's disadvantage. On the contrary, it is manifest that this business produces more open competition through advertisement, sales promotion and other media than any other that comes to our mind and we think it is truly representative of free enterprise as practiced in a democracy." 235 La. at 350, 103 So. 2d at 471.

We do not find the holdings in *Nelsen v. Tilley*, 137 Neb. 327, 289 N. W. 388 (1939), relied on by the appellants in support of their "monopoly" argument, to be persuasive since it was stipulated in those proceedings that Nelsen Auto Sales had "willfully discriminate[d] either directly or

indirectly, in prices between different purchasers of automobiles of like grade and quality, where the effect thereof may be to substantially lessen competition, or tend to create a monopoly, or to injure or destroy the business of a competitor." In this case there is no such evidence; nor, indeed, even a suggestion that the issuance of franchises to a number of new car dealers is any more than the grant of a privilege to deal in specified new motor vehicles, with resultant competition among such dealers to the advantage of the public.

We conclude that the provisions of Art. 66¹/₂, § 3-113.1, are not violative of the "equal protection" clause of the Fourteenth Amendment to the United States Constitution upon any of the grounds asserted by the appellants.

(2)

Petitioners assert that Art. 66¹/₂, § 3-113.1 violates the Due Process Clause of the Fourteenth Amendment as well as Art. 23 of the Maryland Declaration of Rights because it bears no real and substantial relationship to the public health, safety, morals or general welfare; they argue that the requirement of an unexpired franchise from a manufacturer to sell new cars is not rationally related to the general welfare since the statute is conditioned upon the existence of such a franchise, which itself is issued in the discretion of the manufacturer, the effect of which is to prohibit "otherwise qualified persons from engaging in a common, useful and harmless occupation."

Although Art. 23 of the Maryland Declaration of Rights has long "been equated" with the "due process" clause of the Fourteenth Amendment by judicial construction and application, the two provisions are not synonymous. The decisions of the Supreme Court appear to uphold the validity of a regulation as within the exercise of the "police power" and hence not a denial of "due process" if the statutory enactment is based on any reasonable consideration affecting the public welfare. *See Nebbia v. New York*, 291 U. S. 502, 538-39 (1934); *Williamson v. Lee Optical Co.*, 348 U. S. 483, 488 (1955). As pointed out in our decisions in *Salisbury*

*Beauty Schools v. State Bd., supra, Maryland St. Bd. of Barber Examiners v. Kuhn, supra,* and in *Maryland Bd. of Pharmacy v. Sav-A-Lot,* 270 Md. 103, 311 A. 2d 242 (1973), we have followed the "traditional" test formulated in *Lawton v. Steele,* 152 U. S. 133, 137 (1894) and followed in *Goldblatt v. Hempstead,* 369 U. S. 590, 594-95 (1962), requiring that a "real and substantial relationship" to the object sought to be attained by the statutory regulation be shown. *See also Blum v. Engelman,* 190 Md. 109, 115, 57 A. 2d 421, 423 (1948). The federal-state dichotomy was clearly pointed out in *Sav-A-Lot, supra.*

As we stated in *Salisbury Beauty Schools, supra,* in rejecting a contention that Code, Art. 43, § 537 (a), was an invalid exercise of the "police power":

"The Legislature exercises a large discretion in determining what the public welfare requires, in what may be injurious to the general welfare of the public and also what measures are either necessary or appropriate for the protection and promotion of those interests. *A. & H. Transp., Inc. v. Mayor and City Council of Baltimore,* 249 Md. 518, 240 A. 2d 601 (1968); *Maryland Coal and Realty Co. v. Bureau of Mines,* 193 Md. 627, 69 A. 2d 471 (1949); *Davis v. State,* 183 Md. 385, 37 A. 2d 880 (1944).

The exercise by the Legislature of the 'police power', of course, is subject to review by the courts, but the exercise of such power will not be interfered with unless it is shown to be misused or abused, or where it is shown to be exercised arbitrarily, oppressively or unreasonably. *Maryland Coal and Realty Co. v. Bureau of Mines, supra; McBriety v. City of Baltimore,* 219 Md. 223, 148 A. 2d 408 (1959); *Davis v. State, supra; Liberto v. Mayor and City Council of Baltimore,* 180 Md. 105, 23 A. 2d 43 (1941) (footnote omitted). The wisdom or expediency of a law adopted in the exercise of the police power of the state is not subject to judicial review and such a statute will not be held void if

589

there are any considerations relating to the public
welfare by which it can be supported. *Davis v.
State, supra; State v. J. M. Seney Co.,* 134 Md. 437,
107 A. 189 (1919). Such a statute is presumed to be
valid and one attacking its validity has the burden
of affirmatively and clearly establishing its
invalidity; every intendment is in favor of the
validity of the statute where there is a substantial
relationship between its object and the means
employed to attain that object. *Fuller v. County
Commissioners of Baltimore County,* 214 Md. 168,
133 A. 2d 397 (1957); *Grant v. Mayor and City
Council of Baltimore,* 212 Md. 301, 129 A. 2d 363
(1957)." 268 Md. at 48-49, 300 A. 2d at 377-78.

In *Maryland Bd. of Pharmacy v. Sav-A-Lot, supra,* this
Court held the provisions of Code (1957, 1971 Repl. Vol.) Art.
43, § 266A (c)(4)(iv), which subjected a pharmacist to
disciplinary action for gross unprofessional conduct in
advertising prices for prescriptions, etc., to be
unconstitutional. Judge Levine, for the Court, stated:

"[T]he arguments advanced by the Board
demonstrate no 'real and substantial relation to the
object sought to be attained,' by the 'means
selected.' Quite to the contrary, the evidence
indicates that continued existence of the statute is
inversely related to the public health and welfare.
Consequently, we do not hesitate to label it
'unreasonable, arbitrary and capricious,' and
therefore an unconstitutional exercise of the police
power. Although the objectives attributed to the
statute are, indeed, commendable ones, there is no
'substantial relation' between them and the statute.
The result is, and we so hold, that subsection (iv) of
§ 266A (c) (4) violates the Due Process Clause of the
Fourteenth Amendment and Art. 23 of the
Maryland Declaration of Rights." 270 Md. at 121,
311 A. 2d at 252.

The appellants' "due process" argument, inexorably

intertwined as it is with their "equal protection" argument, has in effect been answered by our conclusion that the classification resulting under § 3-113.1 — between new car and used car dealers — was not the result of an arbitrary exercise of the police power, but that the statute did bear a real and substantial relationship to the objectives on the part of the Legislature to insure financial responsibility between the purchasers of a manufacturer's new vehicle and new car dealers, and to guarantee to such purchasers a fulfillment of the manufacturer's terms of warranty. The "real and substantial relationship" found by us to exist in creating the "classification" is dispositive of the contention that the statute does not bear a rational relationship to the general welfare of the public.

We think that § 3-113.1, permitting the holding of a new vehicle for sale by a franchised dealer and authorizing the transfer of new vehicles between dealers possessing franchises from the same manufacturer — "interfamily" type transfers — by delivery to such transferee of the manufacturer's certificate of origin, rather than being required to have a certificate of title issued, maintains the integrity of the relationship between a manufacturer and a new vehicle purchaser and is within the ambit of the discretion vested in the Legislature in determining what appears to be necessary or appropriate for the protection and promotion of the public general welfare.

If, as the appellants seem to suggest, as used car dealers they are being denied the right to engage in a "common, useful and harmless occupation" — as new car dealers — their contention is answered by their own testimony establishing that none of them had ever undertaken to make an application to any manufacturer for the issuance of a franchise, nor had any of them ever applied for a license to sell new motor vehicles.

The "due process" clause does not inhibit a state from insisting that all contract and property rights are held subject to the fair exercise of the police power. *Allied American Co. v. Comm'r*, 219 Md. 607, 617, 150 A. 2d 421, 427 (1959), citing *Atlantic Coast Line v. Goldsboro*, 232 U. S.

548, 558 (1914). Indeed, the appellants concede that "the right to follow a trade or calling is subordinate to the right of the state to adopt reasonable statutory regulations, which the public health, safety or [general] welfare may require."

Article 66½, § 3-113.1, like the Louisiana statute upheld in *Louisiana Motor Vehicle Comm'n v. Wheeling Frenchman, supra,* is permissive rather than prohibitive; it imposes "no restraint in the sale of new and unused cars." As Judge MacDaniel pointed out in his opinion, the appellants are not forbidden by the statute to sell new cars, but:

> "They may legally sell new cars if prescribed preconditions are met. By virtue of Sections 3-101, 3-102, and 3-104, Article 66½, every owner of a vehicle is [required] to have a properly issued certificate of title, except as to new vehicles owned and held for sale by a manufacturer or new car dealer. . . . A new motor vehicle dealer is exempted from paying the excise tax on the new vehicle he obtains from a manufacturer, with whom he holds an unexpired franchise agreement, for sale to others. A used car dealer may purchase and resell a new motor vehicle, as may a consumer customer, after the payment of the excise tax [and the issuance of a certificate of title]. If the purchaser holds a franchise to sell the make of vehicle purchased, the excise tax is not levied and there is no need for [the issuance of] a certificate of title, since Section 3-113.1 (a) and (b) are then followed."

We conclude that the section is a valid exercise of the police power and does not deprive the appellants of any "property" in contravention of the due process clause of the Fourteenth Amendment or of Art. 23 of the Maryland Declaration of Rights.

### (3)

Arguing that the Motor Vehicle Administration fixes no standards as to the qualifications of an applicant for a new

car dealer's license other than the possession of an unexpired franchise from a manufacturer, the appellants contend that § 3-113.1 constitutes an improper and unlawful delegation of the legislative power of the state to such manufacturers and franchise dealers in that it delegates to such manufacturers the determination of the qualifications of such licensees.

This contention was similarly raised and rejected in *Louisiana Motor Vehicle Comm'n v. Wheeling Frenchman, supra,* where that court stated:

> "This argument is illusive but we think it unsound. Nothing has been delegated, in our estimation; the Legislature has simply, under its police power, provided a condition upon which the granting of a license shall depend. No legislative power has been delegated to the motor vehicle manufacturer to select the person or persons it chooses to be its dealer or dealers, as the Legislature has not been invested with any such power. The right of the manufacturer to choose its dealers is merely the right of the freedom of contract. Thus, the asserted delegation of legislative power is not in reality a delegation at all. It is purely the exercise of a legislative discretion in the fixing of standards for qualification as a new car dealer under the law." 235 La. at 346-47, 103 So. 2d at 469.

We concur in these views. The licensing power is vested in the Motor Vehicle Administration. The Legislature has simply created a reasonable and legitimate condition upon which such a license shall be granted; the Legislature exercises no control over the selection of those who may satisfy a manufacturer in connection with the grant of a franchise. The right of the manufacturers to select those dealers for the sale of new motor vehicles is, as the appellants stipulated, "the right of the freedom of contracts."

This contention by the appellants must equally be rejected.

(4)

Obliquely interwoven throughout the appellants' "equal protection" and "due process" arguments, although not explicitly raised as such, is the complaint that § 3-113.1 permits enfranchised new car dealers to transfer a new motor vehicle to another franchised dealer without being required to pay the 4 percent tax imposed by Art. 66½, § 3-831, and that the statute "as a revenue measure" violates the uniformity in taxation mandated by Art. 15 of the Maryland Declaration of Rights.

This Court has consistently recognized the power of the Legislature to grant full exemptions from taxation when reasonable and for a public purpose. *State Tax Comm'n v. Gales,* 222 Md. 543, 548-50, 161 A. 2d 676, 678 (1960). When made for such a purpose and uniformly applied the exemption does not violate Art. 15 of the Declaration of Rights, nor due process of law under Art. 23. *See Murray v. Comptroller,* 241 Md. 383, 392-93, 216 A. 2d 897, 902, *cert. denied,* 385 U. S. 816 (1966); *Armco Steel Corp. v. State Dept. of Assessments & Taxation,* 236 Md. 168, 175-76, 202 A. 2d 741, 745 (1964).

In *Armco Steel Corp. v. State Dept. of Assessments & Taxation, supra,* as well as in *Murray v. Comptroller, supra,* our predecessors cited with approval the statement by Mr. Justice Cardozo in *Williams v. Mayor & City Council of Baltimore,* 289 U. S. 36, 41 (1933), where the validity of a Maryland statute making the property of a particular railroad exempt from taxation was held not to be in violation of either the equal protection clause of the Fourteenth Amendment or of Art. 15 of the Maryland Declaration of Rights. Mr. Justice Cardozo stated:

> " 'The courts of Maryland hold that the rule of uniformity established by these provisions does not forbid the creation of reasonable exemptions in furtherance of the public good. * * * [citing cases] * * *. It does not even prohibit an exemption in favor of an individual as distinguished from one for the benefit of the members of a class. All that it

exacts in respect of the narrower exemption is the presence of a relation, fairly discernible, between the good of the individual and the good of the community. There must be something more than an arbitrary preference of one among many. * * *

'* * * The judicial function is exhausted with the discovery that the relation between means and end is not wholly vain and fanciful, an illusory pretense. Within the field where men of reason may reasonably differ, the legislature must have its way.* * *.' " 236 Md. at 175-76, 202 A. 2d at 745.

More recently, in *Adm'r, Motor Vehicle Administration v. Vogt, supra,* we held that the "traditional" or "fundamental" standards enunciated in *Lindsley v. Natural Carbonic Gas Co., supra,* applies where tax statutes are challenged on equal protection grounds, citing *Walters v. City of St. Louis, Mo.,* 347 U. S. 231 (1954); *Hooks v. Comptroller,* 265 Md. 380, 289 A. 2d 332 (1972); *Fair Lanes, Inc. v. Comptroller,* 265 Md. 361, 289 A. 2d 595 (1972).

As was stated in *Walters v. City of St. Louis, supra*: "The power of the state to classify according to occupation for the purpose of taxation is broad. Equal protection does not require identity of treatment. It only requires that classification rest on real and not feigned differences, that the distinction have some relevance to the purpose for which the classification is made, and that the different treatments be not so disparate, relative to the difference in classification, as to be wholly arbitrary." 347 U. S. at 237.

In *Hooks v. Comptroller, supra,* where we upheld the collection of sales taxes collected from a lessee-taxi driver on the amount paid by him as rent for the taxicab, as well as on the amount paid by him to the cab company for gasoline, Judge Singley, for the Court, said:

"The equal protection clause does not require absolute mathematical equality in regard to state taxation; '[r]ather, it permits great "flexibility and variety that are appropriate to reasonable schemes

of state taxation" as long as the classification is not *per se* or in practical operation palpably arbitrary,' *Lane Corp. v. Comptroller*, 228 Md. 90, 97, 178 A. 2d 904 (1962) [citing *Allied Stores of Ohio, Inc. v. Bowers*, 358 U. S. 522, 526, 79 S. Ct. 437, 3 L.Ed.2d 480 (1959)]. It has long been recognized that taxation is a practical affair, *Frank J. Klein v. Comptroller*, 233 Md. 490, 494, 197 A. 2d 243 (1964), and that 'only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes' can the presumption of constitutionality be rebutted, *Madden v. Kentucky*, 309 U. S. 83, 88, 60 S. Ct. 406, 84 L. Ed. 590 (1940)." 265 Md. at 388, 289 A. 2d at 336.

Thus, the exemption of a reasonably defined class of property from taxation does not violate the equal protection clause of the Fourteenth Amendment if it is shown to be rationally related to a legitimate state purpose. *Ballard v. Supervisor of Assessments*, 269 Md. 397, 406, 306 A. 2d 506, 511 (1973).

Having found under the "traditional" or "fundamental" standards enunciated in *Lindsley v. Natural Carbonic Gas Co.*, *supra*, that there was a rational relationship between the provisions of § 3-113.1 and the objectives sought to be attained by the Legislature for the public general welfare, it follows, a fortiori, that the exemption from the excise tax granted on the transfer of new motor vehicles between dealers franchised by the same manufacturer is consonant with those objectives. The exemption bears a direct relevance to the classification recognized between new and used car dealers, is not in practical operation palpably arbitrary and is predicated on real differences which the Legislature has recognized in connection with the sale of new motor vehicles to the consuming public.

The Legislature in its wisdom has determined that the excise tax provided for in § 3-831 is payable upon the issuance of certificates of title. The exemption from such tax

of inter-dealer transfers for the same franchised make of new vehicle recognizes that such transfers are not to members of the general public, as consumers, and hence there is no need in such transfers to require a certificate of title in order to insure to the purchasing public a source of financial responsibility or to guarantee a fulfillment of the manufacturer's warranty. Additionally, § 3-113.1 recognizes, as between franchised dealers of new vehicles, the same exemption from the excise tax enjoyed by used car dealers under § 3-113 (b) when used cars are transferred between them upon the execution of an assignment of the certificate of title without being required to pay the excise tax.

Treating § 3-113.1 as a "revenue measure" — based upon its interrelationship with § 3-831 — to the extent that it exempts new car dealers from the excise tax, does not violate the due process or equal protection clauses of the Fourteenth Amendment, nor is it in violation of Arts. 15 and 23 of the Maryland Declaration of Rights.

*Order of the Circuit Court for Baltimore County affirmed; costs to be paid by appellants.*

Judge Eldridge concurs in the result.